UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PIMCO FUNDS: PIMCO TOTAL RETURN FUND; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES LONG DURATION CORPORATE BOND PORTFOLIO; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EMERGING MARKETS BOND FUND; PIMCO FUNDS: PIMCO EMERGING MARKETS BOND FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN EMERGING BOND FUND (M); PIMCO BERMUDA TRUST:  PIMCO EMERGING MARKETS BOND FUND (M); PIMCO BERMUDA TRUST II: PIMCO EMERGING BOND INCOME FUND (M); PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME FUND; PIMCO DYNAMIC CREDIT INCOME FUND; PIMCO FUNDS: PIMCO LONG DURATION TOTAL RETURN FUND; PIMCO FUNDS: PIMCO INCOME FUND; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES EMERGING MARKETS PORTFOLIO; PIMCO FUNDS: PIMCO SHORT-TERM FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, INCOME FUND; PIMCO FUNDS: PIMCO EMERGING MARKETS CURRENCY FUND; PIMCO VARIABLE INSURANCE TRUST:  PIMCO EMERGING MARKETS BOND PORTFOLIO; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, TOTAL RETURN BOND FUND; PIMCO FUNDS: PIMCO EMERGING LOCAL BOND FUND; PIMCO INCOME OPPORTUNITY FUND; PIMCO FUNDS: PIMCO UNCONSTRAINED BOND FUND; PIMCO FUNDS: PIMCO MODERATE DURATION FUND; PIMCO VARIABLE INSURANCE TRUST:  PIMCO TOTAL RETURN PORTFOLIO; PIMCO BERMUDA TRUST II: PIMCO BERMUDA EMERGING MARKETS BOND FUND II; PIMCO FUNDS: PIMCO FOREIGN BOND FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EURO INCOME BOND FUND; PIMCO FUNDS: PIMCO STOCKSPLUS® LONG DURATION FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, SOCIALLY RESPONSIBLE EMERGING MARKETS BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME DURATION HEDGED FUND; PIMCO FUNDS: PIMCO LOW DURATION FUND; PIMCO FUNDS: | Civil Case No.<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

GLOBAL INVESTORS SERIES PLC, GLOBAL BOND
FUND; EQUITY TRUSTEES LIMITED AS
RESPONSIBLE ENTITY FOR PIMCO GLOBAL
BOND FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, GLOBAL INVESTMENT
GRADE CREDIT FUND; PIMCO BERMUDA TRUST
IV: PIMCO BERMUDA BRAZIL CORPORATE
BOND FUND (M); PIMCO FUNDS: PIMCO GLOBAL
ADVANTAGE® STRATEGY BOND FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES PLC,
EMERGING LOCAL BOND FUND; PIMCO FUNDS:
PIMCO DIVERSIFIED INCOME FUND; PIMCO
FUNDS: PIMCO COMMODITIESPLUS® STRATEGY
FUND; PIMCO BERMUDA TRUST II:  PIMCO
BERMUDA EMERGING MARKETS BOND FUND
(M); PIMCO FUNDS: PIMCO RAE WORLDWIDE
FUNDAMENTAL ADVANTAGE PLUS FUND;
PIMCO MONTHLY INCOME FUND (CANADA);
PIMCO FUNDS: PIMCO INVESTMENT GRADE
CORPORATE BOND FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC, EMERGING
MARKETS CURRENCY FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
UNCONSTRAINED BOND FUND; PIMCO INCOME
STRATEGY FUND II; PIMCO FUNDS: PIMCO
STOCKSPLUS® SHORT FUND; PIMCO
CORPORATE & INCOME OPPORTUNITY FUND;
PIMCO FUNDS: PIMCO RAE LOW VOLATILITY
PLUS INTERNATIONAL FUND; PIMCO FUNDS:
PIMCO FOREIGN BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO TOTAL RETURN FUND III;
PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC,
LOW AVERAGE DURATION FUND; PIMCO
FUNDS: PIMCO TOTAL RETURN FUND IV; PIMCO
FUNDS: PIMCO RAE FUNDAMENTAL
ADVANTAGE PLUS FUND; PIMCO FUNDS:  PIMCO
RAE FUNDAMENTAL PLUS EMG FUND; PIMCO
FUNDS: PIMCO GLOBAL BOND FUND
(UNHEDGED); PIMCO GLOBAL ADVANTAGE
STRATEGY BOND FUND (CANADA); PIMCO
FUNDS: GLOBAL INVESTORS SERIES PLC,
GLOBAL FUNDAMENTAL INDEX®
STOCKSPLUS® FUND; PIMCO OFFSHORE FUNDS
- PIMCO ABSOLUTE RETURN STRATEGY IV
EFUND; PIMCO ABSOLUTE RETURN STRATEGY
3D OFFSHORE FUND LTD.; PIMCO ABSOLUTE

RETURN STRATEGY III MASTER FUND LDC;
PIMCO CORPORATE & INCOME STRATEGY
FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN
GLOBAL CREDIT ALPHA FUND; PIMCO INCOME
STRATEGY FUND; PIMCO FUNDS:  GLOBAL
INVESTORS SERIES PLC, PIMCO CREDIT
ABSOLUTE RETURN FUND; PIMCO VARIABLE
INSURANCE TRUST:  PIMCO LOW DURATION
PORTFOLIO; PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, US SHORT-TERM FUND; PIMCO
FUNDS: PIMCO RAE FUNDAMENTAL PLUS FUND;
PIMCO CAYMAN TRUST: PIMCO CAYMAN
EUROPEAN HIGH YIELD FUND; PIMCO FUNDS:
PIMCO FLOATING INCOME FUND; PIMCO FUNDS:
PIMCO GLOBAL BOND FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO RAE LOW
VOLATILITY PLUS EMG FUND; PIMCO
VARIABLE INSURANCE TRUST:  PIMCO GLOBAL
ADVANTAGE STRATEGY BOND PORTFOLIO;
PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC,
EURO CREDIT FUND; PIMCO BERMUDA TRUST II:
PIMCO BERMUDA INCOME FUND (M); PIMCO
FUNDS: GLOBAL INVESTORS SERIES PLC,
GLOBAL ADVANTAGE FUND; PIMCO FUNDS:
PIMCO RAE FUNDAMENTAL PLUS
INTERNATIONAL FUND; PIMCO BERMUDA
TRUST IV: PIMCO BERMUDA BRAZIL
GOVERNMENT BOND FUND (M); PIMCO
CAYMAN SPC LIMITED:  PIMCO CAYMAN JAPAN
COREPLUS SEGREGATED PORTFOLIO; PIMCO
FUNDS: PIMCO SHORT ASSET INVESTMENT
FUND; PIMCO VARIABLE INSURANCE TRUST:
PIMCO GLOBAL BOND PORTFOLIO (UNHEDGED);
PIMCO BERMUDA TRUST IV: PIMCO BERMUDA
EMERGING CURRENCY HIGH INCOME FUND;
PIMCO LUXEMBOURG TRUST IV, PIMCO TOTAL
RETURN STRATEGY FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN GLOBAL AGGREGATE
BOND FUND; PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES INVESTMENT GRADE
CORPORATE PORTFOLIO; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC, GLOBAL BOND
EX-US FUND; PIMCO STRATEGIC INCOME FUND,
INC.; PIMCO CAYMAN TRUST:  PIMCO GLOBAL
INVESTMENT GRADE CREDIT FUND; PIMCO
FUNDS: PIMCO STOCKSPLUS® SMALL FUND;

PIMCO FUNDS: PIMCO STOCKSPLUS®
ABSOLUTE RETURN FUND; PIMCO FUNDS:
PIMCO STOCKSPLUS® INTERNATIONAL FUND
(U.S. DOLLAR-HEDGED); PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, US FUNDAMENTAL
INDEX® STOCKSPLUS® FUND; PIMCO BERMUDA
TRUST IV: PIMCO BERMUDA GLOBAL BOND EX-
JAPAN FUND; PIMCO FUNDS:  PIMCO RAE
FUNDAMENTAL PLUS SMALL FUND; PIMCO
FUNDS: PIMCO REALESTATEREALRETURN
STRATEGY FUND; PIMCO SELECT FUNDS PLC:
GLOBAL BOND FUND; PIMCO CAYMAN TRUST:
PIMCO CAYMAN GLOBAL ADVANTAGE
GOVERNMENT EX-JAPAN BOND FUND; PIMCO
DYNAMIC INCOME FUND; PIMCO BERMUDA
TRUST IV: PIMCO BERMUDA DEVELOPING
LOCAL MARKETS FUND; PIMCO VARIABLE
INSURANCE TRUST:  PIMCO FOREIGN BOND
PORTFOLIO (U.S. DOLLAR HEDGED); PIMCO
BERMUDA TRUST: PIMCO REAL RETURN FUND;
PIMCO ABSOLUTE RETURN STRATEGY III
OVERLAY MASTER FUND LTD.; PIMCO FUNDS:
PIMCO UNCONSTRAINED TAX MANAGED BOND
FUND; PIMCO VARIABLE INSURANCE TRUST:
PIMCO UNCONSTRAINED BOND PORTFOLIO;
PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC,
STRATEGIC INCOME FUND; PIMCO MULTI-
SECTOR STRATEGY FUND LTD.; PIMCO
BERMUDA TRUST IV: PIMCO EMERGING BOND
STRATEGY FUND; PIMCO CAYMAN TRUST:
PIMCO CAYMAN GLOBAL ADVANTAGE BOND
FUND; PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, PIMCO DIVIDEND AND INCOME
BUILDER FUND; PIMCO BERMUDA TRUST IV:
PIMCO GLOBAL HIGH YIELD STRATEGY FUND;
PIMCO LUXEMBOURG TRUST,
COMMODITIESPLUS STRATEGY FUND; PIMCO
FUNDS: PIMCO STOCKSPLUS® FUND; PIMCO
BERMUDA TRUST IV: PIMCO BERMUDA
EMERGING MARKETS AND INFRASTRUCTURE
BOND FUND (M); PIMCO FUNDS:  GLOBAL
INVESTORS SERIES PLC, PIMCO EMERGING
MULTI-ASSET FUND; PIMCO VARIABLE
INSURANCE TRUST:  PIMCO FOREIGN BOND
PORTFOLIO (UNHEDGED); PIMCO LARGE CAP
STOCKSPLUS ABSOLUTE RETURN FUND; PIMCO

VARIABLE INSURANCE TRUST:  PIMCO SHORT-
TERM PORTFOLIO; PIMCO CAYMAN SPC
LIMITED:  PIMCO CAYMAN JAPAN LOW
DURATION SEGREGATED PORTFOLIO; PIMCO
FUNDS: GLOBAL INVESTORS SERIES PLC, LOW
DURATION GLOBAL INVESTMENT GRADE
CREDIT FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, US SMALL CAP
STOCKSPLUS® FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, EM FUNDAMENTAL
INDEX® STOCKSPLUS® FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
STOCKSPLUS™ FUND; PIMCO EMERGING
MARKETS CURRENCY COLLECTIVE TRUST;
PIMCO TOTAL RETURN COLLECTIVE TRUST;
PIMCO REALESTATEPLUS COLLECTIVE TRUST;
PIMCO COMMODITIESPLUS COLLECTIVE TRUST;
PIMCO GLOBAL ADVANTAGE STRATEGY
COLLECTIVE TRUST; ACCIDENT
COMPENSATION CORPORATION; ALLIANZ
GLOBAL INVESTORS GMBH ACTING ON BEHALF
OF ALLIANZGI-FONDS ISAR SEGMENT ISAR EM-
RENTEN; ALLIANZ GLOBAL INVESTORS GMBH
ACTING ON BEHALF OF CBP GROWTH SEGMENT
RENTEN EMERGING MARKET; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZGI-FONDS ISAR SEGMENT ISAR PI-
RENTEN; ALLIANZ GLOBAL INVESTORS GMBH
ACTING ON BEHALF OF ALLIANZ APKR PIMCO
EMERGING MARKETS FONDS; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZ ALIK PIMCO US CORPORATES;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ VKRD PIMCO US
CORPORATES; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ APAV
PIMCO US CORPORATES FONDS; ALLIANZ
GLOBAL INVESTORS GMBH ACTING ON BEHALF
OF ALLIANZ PV 1 PIMCO US CORPORATES;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZGI-FONDS D300
SEGMENT PICORNF; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZ GLR SUB EM; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZ AKR PIMCO HARD CURRENCY

EMERGING MARKETS; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZ LFE PIMCO HARD CURRENCY EM;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ AADB EM HARD
CURRENCY; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ ARD
PIMCO HARD CURRENCY EMERGING MARKETS;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ ARD PIMCO US
CORPORATES FONDS; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZ GLR PIMCO US CORPORATES FONDS;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ RFG PIMCO US
CORPORATES; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ VGI 1
PIMCO US CORPORATES FONDS; ALLIANZ
GLOBAL INVESTORS GMBH ACTING ON BEHALF
OF ALLIANZ VKRD PIMCO NON-FINANCIAL
CORPORATES; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ VKRD
PIMCO CORPORATES; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF
ALLIANZ AVM-B PIMCO NON-FINANCIAL
CORPORATES; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ ALD
PIMCO NON FINANCIAL CORPORATES; ALLIANZ
GLOBAL INVESTORS GMBH ACTING ON BEHALF
OF ALLIANZ APAV PIMCO CORPORATES;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ SDR FONDS; ALLIANZ
GLOBAL INVESTORS GMBH ACTING ON BEHALF
OF ALLIANZ ALD PIMCO EURO AGGREGATE;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ VKRD PIMCO DIREKT;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ ALD PIMCO DIREKT;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ PV-RD PIMCO DIREKT;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ AADB PIMCO EURO
AGGREGATE; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ UGD 1
SUB GOV/COVERED; ALLIANZ GLOBAL
INVESTORS GMBH ACTING ON BEHALF OF

ALLIANZ AKR PIMCO EURO AGGREGATE;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ RE ASIA EUR FUND;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ VGI 1 PIMCO EURO
AGGREGATE; ALLIANZ GLOBAL INVESTORS
GMBH ACTING ON BEHALF OF ALLIANZ ALIK
NON FINANCIAL CORPORATES; ALLIANZ
GLOBAL INVESTORS GMBH ACTING ON BEHALF
OF ALLIANZ ALIK PIMCO CORPORATES;
ALLIANZ GLOBAL INVESTORS GMBH ACTING
ON BEHALF OF ALLIANZ APAV PIMCO DIREKT;
ALLIANZ LIFE INSURANCE COMPANY OF
NORTH AMERICA; ALLIANZ RETIREMENT PLAN
– PROPERTY/CASUALTY; AON HEWITT GROUP
TRUST FOR THE LONG CREDIT BOND FUND;
AON HEWITT GROUP TRUST FOR THE
INTERMEDIATE CREDIT BOND FUND; BLUE
CROSS BLUE SHIELD OF MINNESOTA, INC.; MII
LIFE, INC.; THE BOEING COMPANY EMPLOYEE
RETIREMENT PLANS MASTER TRUST; THE
BOEING COMPANY EMPLOYEE SAVINGS PLANS
MASTER TRUST; CUMMINS INC. AND
AFFILIATES COLLECTIVE INVESTMENT TRUST;
DESJARDINS FLOATING RATE INCOME FUND;
DESJARDINS GLOBAL TACTICAL BOND FUND;
FCA US LLC MASTER RETIREMENT TRUST; FDP
GLOBAL FIXED INCOME PORTFOLIO; FIREMAN'S
FUND INSURANCE COMPANY; FUBON LIFE
INSURANCE COMPANY LIMITED; THE
GLENCORE CANADA PENSION FUNDS TRUST –
BOND FUND; THE GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA; THE GUARDIAN LIFE
INSURANCE COMPANY OF AMERICA MASTER
PENSION TRUST; THE GUARDIAN INSURANCE
AND ANNUITY COMPANY, INC.; BERKSHIRE
LIFE INSURANCE COMPANY OF AMERICA;
HARBOR COMMODITY REAL RETURN
STRATEGY FUND; HARBOR EMERGING
MARKETS EQUITY FUND; HARBOR CAPITAL
GROUP TRUST FOR THE DEFINED BENEFIT
PLAN; INGERSOLL-RAND COMPANY
COLLECTIVE TRUST; TRANE PENSION PLAN
MASTER TRUST; NATIONAL PENSION SERVICE;
NEW SHIPS, INC. PENSION MASTER TRUST;
NOVA SCOTIA PUBLIC SERVICE

SUPERANNUATION FUND; NOVA SCOTIA
TEACHERS' PENSION FUND; RBC CANADIAN
MASTER TRUST; ROCHE U.S. RETIREMENT
PLANS MASTER TRUST; INTERVENTURE FIXED
INCOME INVESTMENTS LIMITED; STICHTING
BEDRIJFSPENSIOENFONDS VOOR DE
AGRARISCHE EN
VOEDSELVOORZIENINGSHANDEL; WESTERN
ASSET TOTAL RETURN UNCONSTRAINED (TRU)
BOND MASTER FUND, LTD.; WESTERN ASSET
EMERGING MARKETS CORPORATE CREDIT
SECURITIES PORTFOLIO, L.L.C.; WESTERN ASSET
US LONG DURATION, LLC; WESTERN ASSET
MACRO OPPORTUNITIES PORTFOLIO MASTER;
WESTERN ASSET GLOBAL MULTI SECTOR, LLC;
WESTERN ASSET US CORE PLUS, LLC; LEGG
MASON WESTERN ASSET MACRO
OPPORTUNITIES BOND FUND; LEGG MASON
WESTERN ASSET GLOBAL MULTI STRATEGY
FUND; LEGG MASON GLOBAL FUNDS PLC,
WESTERN ASSET EMERGING MARKET
CORPORATE BOND FUND; LEGG MASON
WESTERN ASSET EMERGING MARKETS TOTAL
RETURN BOND FUND; LEGG MASON WESTERN
ASSET GLOBAL CORE PLUS BOND FUND;
WESTERN ASSET INCOME FUND; WESTERN
ASSET CORE PLUS BOND FUND; WESTERN
ASSET CORE BOND FUND; WESTERN ASSET
TOTAL RETURN UNCONSTRAINED FUND (FKA:
ABSOLUTE RETURN); WESTERN ASSET MACRO
OPPORTUNITIES FUND; WESTERN ASSET
INTERMEDIATE BOND FUND; WESTERN ASSET
HIGH YIELD FUND; WESTERN ASSET PREMIER
BOND FUND; WESTERN ASSET US
INTERMEDIATE PLUS, LLC; WESTERN
ASSET/CLAYMORE U.S. TREASURY INFLATION
PROTECTED SECURITIES FUND; WESTERN
ASSET EMERGING MARKETS DEBT FUND INC.;
WESTERN ASSET EMERGING MARKETS INCOME
FUND II INC.; WESTERN ASSET WORLDWIDE
INCOME FUND, INC.; WESTERN ASSET HIGH
INCOME FUND II, INC.; WESTERN ASSET HIGH
INCOME OPPORTUNITY FUND INC.; WESTERN
ASSET INVESTMENT GRADE DEFINED
OPPORTUNITY TRUST INC.; WESTERN ASSET
GLOBAL HIGH INCOME FUND, INC.; WESTERN

ASSET MANAGED HIGH INCOME FUND, INC.;
WESTERN ASSET GLOBAL CORPORATE DEFINED
OPPORTUNITY FUND, INC.; WESTERN ASSET
HIGH YIELD DEFINED OPPORTUNITY FUND INC;
WESTERN ASSET GLOBAL PARTNERS INCOME
FUND INC.; WESTERN ASSET VARIABLE RATE
STRATEGIC FUND, INC.; WESTERN ASSET
EMERGING MARKETS DEBT FUND; WESTERN
ASSET SMASH SERIES C FUND; WESTERN ASSET
CORPORATE BOND FUND; WESTERN ASSET
SMASH SERIES EC FUND; WESTERN ASSET
GLOBAL STRATEGIC INCOME FUND; WESTERN
ASSET ADJUSTABLE RATE INCOME FUND;
WESTERN ASSET CORE PLUS VIT PORTFOLIO;
WESTERN ASSET VARIABLE GLOBAL HIGH
YIELD BOND PORTFOLIO; WESTERN ASSET
GLOBAL HIGH YIELD BOND FUND; LEGG
MASON WESTERN ASSET US CORE BOND FUND;
WESTERN ASSET US CORE BOND, LLC; LEGG
MASON WESTERN ASSET GLOBAL HIGH YIELD
BOND FUND; LEGG MASON WESTERN ASSET US
CORE PLUS BOND FUND; WESTERN ASSET
STRATEGIC US$ HIGH YIELD PORTFOLIO, LLC;
WESTERN ASSET MACRO OPPORTUNITIES
ALTERNATIVES FUND, LTD; WESTERN
ASSET/CLAYMORE U.S. TREASURY INFLATION
PROTECTED SECURITIES FUND 2; LEGG MASON
WESTERN ASSET GLOBAL CREDIT FUND; LEGG
MASON WESTERN ASSET EURO HIGH YIELD
FUND; LEGG MASON IF WESTERN ASSET
GLOBAL MULTI STRATEGY BOND FUND; LEGG
MASON WESTERN ASSET GLOBAL CREDIT
ABSOLUTE RETURN FUND; ASHWOOD
INVESTMENTS LIMITED; BAHA'I  WORLD
CENTRE; KAISER FOUNDATION HEALTH PLAN,
INC.; KAISER FOUNDATION HOSPITALS; KAISER
FOUNDATION HEALTH PLAN OF COLORADO;
PCS ADMINISTRATION MASTER PENSION
TRUST; HAND BENEFITS & TRUST COMPANY;
HAND COMPOSITE EMPLOYEE BENEFIT TRUST;
OKLAHOMA TOBACCO SETTLEMENT
ENDOWMENT TRUST FUND; CATHAY MULTI-
STRATEGY HIGH-YIELD BOND FUND; KUWAIT
INVESTMENT AUTHORITY; KUWAIT
INVESTMENT AUTHORITY – GLOBAL BOND EX-
US (FIXED INCOME) CORE; KUWAIT

INVESTMENT AUTHORITY – GLOBAL BOND
OPPORTUNISTIC PORTFOLIO; CON-WAY
RETIREMENT MASTER TRUST; and MARSHFIELD
CLINIC MASTER TRUST FOR THE EMPLOYEES'
RETIREMENT PLAN AND SALARY
REDUCTION/401(K) PLAN,

              Plaintiffs,

    v.

PETRÓLEO BRASILEIRO S.A.; PETROBRAS
INTERNATIONAL FINANCE COMPANY S.A.;
PETROBRAS GLOBAL FINANCE B.V.; MARIA DAS
GRAÇAS SILVA FOSTER; JOSÉ SERGIO
GABRIELLI; ALMIR GUILHERME BARBASSA;
JOSUÉ CHRISTIANO GOMES DA SILVA; SÍLVIO
SINEDINO PINHEIRO; DANIEL LIMA DE
OLIVEIRA; JOSÉ RAIMUNDO BRANDÃO
PEREIRA; SÉRVIO TÚLIO DA ROSA TINOCO;
PAULO JOSÉ ALVES; GUSTAVO TARDIN
BARBOSA; ALEXANDRE QUINTÃO FERNANDES;
MARCOS ANTONIO ZACARIAS; CORNELIS
FRANCISCUS JOZEF LOOMAN; and THEODORE
MARSHALL HELMS,

              Defendants.

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ..................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................4

III.  PARTIES ...............................................................................................................5

    A.    Plaintiffs ......................................................................................................5

    B.    Defendants ................................................................................................37

        1.    Petrobras, PGF, and PifCo .........................................................37

        2.    Individual Defendants ................................................................39

IV.   RELEVANT SECURITIES ...............................................................................41

    A.    ADS...........................................................................................................41

    B.    2003 – 2012 Notes ...................................................................................41

    C.    2013 and 2014 Notes ...............................................................................43

        1.    2013 Note Offering .....................................................................43

        2.    2014 Note Offering .....................................................................44

    D.    Non-U.S. Dollar Denominated Notes ...................................................45

V.    SUMMARY OF SUBSTANTIVE ALLEGATIONS......................................46

    A.    Petrobras's Expanding Need for Capital Investment..........................46

    B.    Rules and Regulations Governing Bidding for Petrobras Contracts ...................47

    C.    Fraud and Bribery Schemes ...................................................................48

        1.    The "Operation Car Wash" Investigation ................................48

        2.    The Scheme Skewed Bidding to Maximize Profits for Cartel Members ...................50

        3.    Bribes and Kick-Backs Included in the Petrobras Contracts ...................52

        4.    The Inflated Costs of Petrobras's Refineries and Other Projects ..............54

        5.    Petrobras's Senior Executives' Knowledge of the Scheme ...................57

   6.  Petrobras's Admission of Inflated Asset Values ....................................57

 D.  Petrobras's False and Misleading Financial Statements ........................................62

VI. EXCHANGE ACT ........................................................................................68

 A.  Overview of Claims ..............................................................................68

 B.  False and Misleading Statements ............................................................69

 C.  Petrobras's Corrective Disclosures and Their Impact on the Market ...................93

 D.  Defendants' Knowledge of the Fraudulent Scheme ...........................................104

   1.  Petrobras, PifCo, and PGF ....................................................104

   2.  Foster ...............................................................................105

   3.  Gabrielli ...........................................................................106

   4.  Barbassa ...........................................................................106

 E.  Plaintiffs' Detrimental Reliance on Defendants' Misrepresentations ...............107

   1.  Direct Reliance on Defendants' Misrepresentations.................................107

   2.  Fraud on the Market Presumption of Reliance .......................................131

   3.  No Safe Harbor ..................................................................133

 F.  Plaintiffs' Losses ..............................................................................133

VII. EXCHANGE ACT CAUSES OF ACTION ................................................................134

COUNT I ...............................................................................................................134

COUNT II ..............................................................................................................135

VIII. SECURITIES ACT .......................................................................................135

 A.  Overview of Claims ..............................................................................135

 B.  Relevant Securities Offerings ................................................................136

 C.  False and Misleading Statements ............................................................136

IX. SECURITIES ACT CAUSES OF ACTION ................................................................137

COUNT III ............................................................................................................137

COUNT IV...........................................................................................................138

X.      PRAYER FOR RELIEF ...........................................................................139

XI.     JURY DEMAND.......................................................................................139

1.      Plaintiffs (defined in Section III.A below), by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged on personal knowledge.  Plaintiffs base their allegations upon an investigation by Plaintiffs' counsel, which included a review of (1) U.S. Securities and Exchange Commission ("SEC") filings by Petróleo Brasileiro S.A. ("Petrobras" or the "Company"); (2) regulatory filings and reports; (3) securities analysts' reports and advisories about the Company; (4) press releases and other public statements issued by the Company; (5) media reports about the Company (including statements to the media by various individuals regarding their participation in the kick-back and bribery scheme detailed below); and (6) other publicly available information concerning Petrobras and the other defendants.  Plaintiffs believe that a reasonable opportunity for discovery will provide additional evidentiary support for their claims.

## I.      NATURE OF THE ACTION

2.      This is an action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").  Plaintiffs purchased or otherwise acquired the securities of Petrobras and its two wholly-owned subsidiaries—Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF")—in the United States at various times during the period from October 16, 2010 to May 15, 2015 (the "Relevant Period").

3.      Plaintiffs' Exchange Act claims allege that Defendants (defined in Section III.B below) engaged in a fraudulent scheme that artificially inflated the price of Petrobras Securities (defined in paragraph 111 below) during the Relevant Period.

1

4.     Plaintiffs' Securities Act claims allege that Defendants made material misstatements in the 2013 Offering Documents and 2014 Offering Documents (defined in paragraphs 103 and 105 below) issued in connection with two debt offerings.

5.     Before and throughout the Relevant Period, Petrobras pursued plans to expand its production capacity, which involved acquiring and constructing petroleum production assets. These expansion plans required substantial capital investment.  To satisfy its capital requirements, the Company undertook a number of securities offerings and sold more than $98 billion in securities registered on the New York Stock Exchange ("NYSE"), including American Depository Shares ("ADS") representing common and preferred stock.  During the Relevant Period, Petrobras's ADS were one of the most actively traded shares on the NYSE.

6.     Plaintiffs' claims arise from a series of Defendants' false statements of material fact, and omissions of material adverse information, concerning the following subjects: (1) the value of Petrobras's assets; (2) the Company's periodic expenses and net income; (3) the Company's anti-bribery and anti-corruption policies; and (4) the adequacy of the Company's disclosure controls and procedures, including its internal controls over financial reporting.  When the Company made corrective disclosures revealing the truth about these matters, the market value of the Petrobras Securities dropped materially.

7.     At its height in 2008, Petrobras was the world's fifth-largest company with a market valuation of $310 billion.  Now, with the revelation of Petrobras's rampant money-laundering and kick-back scheme, Petrobras has a market capitalization of just $33.13 billion. Company executives have been jailed and powerful politicians across party lines—including the speakers of both of Brazil's houses of Congress—have been questioned about the money-laundering and bribery scheme.  On August 20, 2015, Brazilian authorities charged the speaker

of Brazil's lower house of Congress with corruption.  According to Brazilian prosecutors, construction and engineering firms paid some $800 million to politically appointed Petrobras executives in exchange for lucrative contracts with the Company, which benefitted both the Petrobras executives and the campaign coffers of the Workers' Party (a Brazilian political party that has governed at the federal level since 2003).  The Petrobras executives that received the bribes pocketed vast sums of money.  The executives also said they channeled portions of the bribes to the Workers' Party, some of which were used in Dilma Rousseff's successful 2010 campaign for re-election as the President of Brazil.

8.      The fraud at the center of this action involves a money-laundering scandal in which Petrobras's contractors colluded with Petrobras executives to inflate bids and provide kick-backs to the executives, Brazilian politicians, and money launderers.  Authorities estimate that the bribery and money-laundering scheme diverted more than $28 billion from Petrobras's coffers.  The illegal bribery and kick-back scheme involved not only Petrobras executives, but also politicians and a group of at least sixteen contractors that formed a cartel to assure that its members would win Petrobras's major contracts.  According to Brazilian authorities, Petrobras executives awarded contracts to construction companies that systemically inflated costs such that they could "stretch[]" their profits "to the limit the contracting enterprise allow[ed]."  As a result, Petrobras paid an amount "much higher than the real value[]" for the major contracts.  Moreover, after winning the contracts, the construction companies kicked back up to 3% of each contract's total value as bribes to Petrobras executives, Brazilian politicians, and money launderers.

9.      The Petrobras scheme was pervasive; as of February 13, 2015, two thousand Petrobras employees were under investigation.  Alberto Youssef—a black market money launderer who initially led investigators to the Petrobras scheme and who is now cooperating

with prosecutors in exchange for a reduced sentence—testified that the bribery and money-laundering scheme was rampant at Petrobras.  As explained more fully below, numerous top Petrobras executives who have been arrested for their involvement in the fraudulent scheme are now cooperating with the investigation and have testified regarding the broad scope of the illegal activity.  All the while, Petrobras covered up the scheme and continuously deflected and denied wrongdoing, keeping investors in the dark.

10.     The Petrobras scheme ultimately calls into question the integrity of the Company as a whole.  Defendants' misstatements relate to the value of Petrobras's oil-producing infrastructure, which is the core of its business.  Unsurprisingly, when the truth of the corruption began to emerge, the value of Petrobras Securities dropped materially.

## II.     JURISDICTION AND VENUE

11.     Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); Rule 10b-5 promulgated by the SEC, 17 C.F.R. § 240.10b-5; and Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77t.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22(a) of the Securities Act, and 28 U.S.C. § 1391(b).  Petrobras maintains an office in this District, has debt securities listed on the NYSE in this District, sponsors ADS representing the Company's common and preferred equity that are listed and trade on the NYSE in this District, and certain of the acts that constitute the violations of law, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Plaintiffs

15.     Pacific Investment Management Company LLC ("PIMCO") is an investment management firm headquartered in Newport Beach, California.  It sponsors hundreds of investment funds, including the following Plaintiff funds:

(1)     PIMCO Funds: PIMCO Total Return Fund

(2)     PIMCO Funds: Private Account Portfolio Series Long Duration Corporate Bond Portfolio

(3)     PIMCO Funds: Global Investors Series plc, Emerging Markets Bond Fund

(4)     PIMCO Funds: PIMCO Emerging Markets Bond Fund

(5)     PIMCO Cayman Trust: PIMCO Cayman Emerging Bond Fund (M)

(6)     PIMCO Bermuda Trust:  PIMCO Emerging Markets Bond Fund (M)

(7)     PIMCO Bermuda Trust II:  PIMCO Emerging Bond Income Fund (M)

(8)     PIMCO Funds: Global Investors Series plc, Diversified Income Fund

(9)     PIMCO Dynamic Credit Income Fund

(10)     PIMCO Funds: PIMCO Long Duration Total Return Fund

(11)     PIMCO Funds: PIMCO Income Fund

(12)     PIMCO Funds: Private Account Portfolio Series Emerging Markets Portfolio

(13)     PIMCO Funds: PIMCO Short-Term Fund

(14)     PIMCO Funds: Global Investors Series plc, Income Fund

(15)     PIMCO Funds: PIMCO Emerging Markets Currency Fund

(16)   PIMCO Variable Insurance Trust:  PIMCO Emerging Markets Bond Portfolio

(17)   PIMCO Funds: Global Investors Series plc, Total Return Bond Fund

(18)   PIMCO Funds: PIMCO Emerging Local Bond Fund

(19)   PIMCO Income Opportunity Fund

(20)   PIMCO Funds: PIMCO Unconstrained Bond Fund

(21)   PIMCO Funds: PIMCO Moderate Duration Fund

(22)   PIMCO Variable Insurance Trust:  PIMCO Total Return Portfolio

(23)   PIMCO Bermuda Trust II: PIMCO Bermuda Emerging Markets Bond Fund II

(24)   PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged)

(25)   PIMCO Funds: Global Investors Series plc, Euro Income Bond Fund

(26)   PIMCO Funds: PIMCO StocksPLUS® Long Duration Fund

(27)   PIMCO Funds: Global Investors Series plc, Socially Responsible Emerging Markets Bond Fund

(28)   PIMCO Funds: Global Investors Series plc, Diversified Income Duration Hedged Fund

(29)   PIMCO Funds: PIMCO Low Duration Fund

(30)   PIMCO Funds: Global Investors Series plc, Global Bond Fund

(31)   Equity Trustees Limited as responsible entity for PIMCO Global Bond Fund

(32)   PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund

(33)   PIMCO Bermuda Trust IV: PIMCO Bermuda Brazil Corporate Bond Fund (M)

(34)   PIMCO Funds: PIMCO Global Advantage® Strategy Bond Fund

(35)   PIMCO Funds: Global Investors Series plc, Emerging Local Bond Fund

(36)   PIMCO Funds: PIMCO Diversified Income Fund

(37)   PIMCO Funds: PIMCO CommoditiesPLUS® Strategy Fund

(38)   PIMCO Bermuda Trust II:  PIMCO Bermuda Emerging Markets Bond Fund (M)

(39)   PIMCO Funds: PIMCO RAE Worldwide Fundamental Advantage PLUS Fund

6

(40)     PIMCO Monthly Income Fund (Canada)

(41)     PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund

(42)     PIMCO Funds: Global Investors Series plc, Emerging Markets Currency Fund

(43)     PIMCO Funds: Global Investors Series plc, Unconstrained Bond Fund

(44)     PIMCO Income Strategy Fund II

(45)     PIMCO Funds: PIMCO StocksPLUS® Short Fund

(46)     PIMCO Corporate & Income Opportunity Fund

(47)     PIMCO Funds: PIMCO RAE Low Volatility PLUS International Fund

(48)     PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged)

(49)     PIMCO Funds: PIMCO Total Return Fund III

(50)     PIMCO Funds: Global Investors Series plc, Low Average Duration Fund

(51)     PIMCO Funds: PIMCO Total Return Fund IV

(52)     PIMCO Funds: PIMCO RAE Fundamental Advantage PLUS Fund

(53)     PIMCO Funds:  PIMCO RAE Fundamental PLUS EMG Fund

(54)     PIMCO Funds: PIMCO Global Bond Fund (Unhedged)

(55)     PIMCO Global Advantage Strategy Bond Fund (Canada)

(56)     PIMCO Funds: Global Investors Series plc, Global Fundamental Index®
         StocksPLUS® Fund

(57)     PIMCO Offshore Funds - PIMCO Absolute Return Strategy IV eFund

(58)     PIMCO Absolute Return Strategy 3D Offshore Fund Ltd.

(59)     PIMCO Absolute Return Strategy III Master Fund LDC

(60)     PIMCO Corporate & Income Strategy Fund

(61)     PIMCO Cayman Trust: PIMCO Cayman Global Credit Alpha Fund

(62)     PIMCO Income Strategy Fund

(63)     PIMCO Funds:  Global Investors Series plc, PIMCO Credit Absolute Return Fund

(64)     PIMCO Variable Insurance Trust:  PIMCO Low Duration Portfolio

(65)   PIMCO Funds: Global Investors Series plc, US Short-Term Fund

(66)   PIMCO Funds: PIMCO RAE Fundamental PLUS Fund

(67)   PIMCO Cayman Trust: PIMCO Cayman European High Yield Fund

(68)   PIMCO Funds: PIMCO Floating Income Fund

(69)   PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged)

(70)   PIMCO Funds: PIMCO RAE Low Volatility PLUS EMG Fund

(71)   PIMCO Variable Insurance Trust:  PIMCO Global Advantage Strategy Bond Portfolio

(72)   PIMCO Funds: Global Investors Series plc, Euro Credit Fund

(73)   PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M)

(74)   PIMCO Funds: Global Investors Series plc, Global Advantage Fund

(75)   PIMCO Funds:  PIMCO RAE Fundamental PLUS International Fund

(76)   PIMCO Bermuda Trust IV: PIMCO Bermuda Brazil Government Bond Fund (M)

(77)   PIMCO Cayman SPC Limited:  PIMCO Cayman Japan CorePLUS Segregated Portfolio

(78)   PIMCO Funds: PIMCO Short Asset Investment Fund

(79)   PIMCO Variable Insurance Trust:  PIMCO Global Bond Portfolio (Unhedged)

(80)   PIMCO Bermuda Trust IV: PIMCO Bermuda Emerging Currency High Income Fund

(81)   PIMCO Luxembourg Trust IV, PIMCO Total Return Strategy Fund

(82)   PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund

(83)   PIMCO Funds: Private Account Portfolio Series Investment Grade Corporate Portfolio

(84)   PIMCO Funds: Global Investors Series plc, Global Bond Ex-US Fund

(85)   PIMCO Strategic Income Fund, Inc.

(86)   PIMCO Cayman Trust:  PIMCO Global Investment Grade Credit Fund

(87)   PIMCO Funds: PIMCO StocksPLUS® Small Fund

(88)    PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund

(89)    PIMCO Funds: PIMCO StocksPLUS® International Fund (U.S. Dollar-Hedged)

(90)    PIMCO Funds: Global Investors Series plc, US Fundamental Index® StocksPLUS® Fund

(91)    PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund

(92)    PIMCO Funds:  PIMCO RAE Fundamental PLUS Small Fund

(93)    PIMCO Funds: PIMCO RealEstateRealReturn Strategy Fund

(94)    PIMCO Select Funds plc: Global Bond Fund

(95)    PIMCO Cayman Trust:  PIMCO Cayman Global Advantage Government Ex-Japan Bond Fund

(96)    PIMCO Dynamic Income Fund

(97)    PIMCO Bermuda Trust IV: PIMCO Bermuda Developing Local Markets Fund

(98)    PIMCO Variable Insurance Trust:  PIMCO Foreign Bond Portfolio (U.S. Dollar Hedged)

(99)    PIMCO Bermuda Trust : PIMCO Real Return Fund

(100)   PIMCO Absolute Return Strategy III Overlay Master Fund Ltd.

(101)   PIMCO Funds: PIMCO Unconstrained Tax Managed Bond Fund

(102)   PIMCO Variable Insurance Trust:  PIMCO Unconstrained Bond Portfolio

(103)   PIMCO Funds: Global Investors Series plc, Strategic Income Fund

(104)   PIMCO Multi-Sector Strategy Fund Ltd.

(105)   PIMCO Bermuda Trust IV: PIMCO Emerging Bond Strategy Fund

(106)   PIMCO Cayman Trust: PIMCO Cayman Global Advantage Bond Fund

(107)   PIMCO Funds: Global Investors Series plc, PIMCO Dividend and Income Builder Fund

(108)   PIMCO Bermuda Trust IV: PIMCO Global High Yield Strategy Fund

(109)   PIMCO Luxembourg Trust, CommoditiesPLUS Strategy Fund

(110)   PIMCO Funds: PIMCO StocksPLUS® Fund

(111)  PIMCO Bermuda Trust IV: PIMCO Bermuda Emerging Markets and Infrastructure Bond Fund (M)

(112)  PIMCO Funds:  Global Investors Series plc, PIMCO Emerging Multi-Asset Fund

(113)  PIMCO Variable Insurance Trust:  PIMCO Foreign Bond Portfolio (Unhedged)

(114)  PIMCO Large Cap StocksPLUS Absolute Return Fund

(115)  PIMCO Variable Insurance Trust:  PIMCO Short-Term Portfolio

(116)  PIMCO Cayman SPC Limited:  PIMCO Cayman Japan Low Duration Segregated Portfolio

(117)  PIMCO Funds: Global Investors Series plc, Low Duration Global Investment Grade Credit Fund

(118)  PIMCO Funds: Global Investors Series plc, US Small Cap StocksPLUS® Fund

(119)  PIMCO Funds: Global Investors Series plc, EM Fundamental Index® StocksPLUS® Fund

(120)  PIMCO Funds: Global Investors Series plc, StocksPLUS™ Fund

16.    Plaintiff Accident Compensation Corporation is a corporation organized under the laws of New Zealand with its principal place of business in Wellington, New Zealand.  During the Relevant Period, PIMCO served as Accident Compensation Corporation's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Accident Compensation Corporation's PIMCO-managed investments in Petrobras Securities.

17.    Plaintiff Allianz Global Investors GmbH ("AGI") is an investment management firm headquartered at Bockenheimer Landstrasse 42-44, 60329 Frankfurt am Main, Germany. From October 16, 2010 to December 31, 2011, AGI's own investment managers made and managed AGI's investments in Petrobras Securities.  From January 1, 2012 to May 15, 2015, PIMCO served as AGI's investment manager.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, AGI's investments in

Petrobras Securities.  AGI sponsors hundreds of investment funds, including the following

Plaintiff funds:

(1)     Allianz Global Investors GmbH acting on behalf of AllianzGI-Fonds ISAR Segment ISAR EM-Renten

(2)     Allianz Global Investors GmbH acting on behalf of CBP Growth Segment Renten Emerging Market

(3)     Allianz Global Investors GmbH acting on behalf of AllianzGI-Fonds ISAR Segment ISAR PI-Renten

(4)     Allianz Global Investors GmbH acting on behalf of Allianz APKR Pimco Emerging Markets Fonds

(5)     Allianz Global Investors GmbH acting on behalf of Allianz ALIK PIMCO US Corporates

(6)     Allianz Global Investors GmbH acting on behalf of Allianz VKRD PIMCO US Corporates

(7)     Allianz Global Investors GmbH acting on behalf of Allianz APAV Pimco US Corporates Fonds

(8)     Allianz Global Investors GmbH acting on behalf of Allianz PV 1 Pimco US Corporates

(9)     Allianz Global Investors GmbH acting on behalf of AllianzGI-Fonds D300 Segment PICORNF

(10)    Allianz Global Investors GmbH acting on behalf of Allianz GLR Sub EM

(11)    Allianz Global Investors GmbH acting on behalf of Allianz AKR Pimco Hard Currency Emerging Markets

(12)    Allianz Global Investors GmbH acting on behalf of Allianz LFE Pimco Hard Currency EM

(13)    Allianz Global Investors GmbH acting on behalf of Allianz AADB EM Hard Currency

(14)    Allianz Global Investors GmbH acting on behalf of Allianz ARD PIMCO Hard Currency Emerging Markets

(15)    Allianz Global Investors GmbH acting on behalf of Allianz ARD Pimco US Corporates Fonds

(16)  Allianz Global Investors GmbH acting on behalf of Allianz GLR Pimco US
      Corporates Fonds

(17)  Allianz Global Investors GmbH acting on behalf of Allianz RFG PIMCO US
      Corporates

(18)  Allianz Global Investors GmbH acting on behalf of Allianz VGI 1 Pimco US
      Corporates Fonds

(19)  Allianz Global Investors GmbH acting on behalf of Allianz VKRD PIMCO Non-
      Financial Corporates

(20)  Allianz Global Investors GmbH acting on behalf of Allianz VKRD Pimco
      Corporates

(21)  Allianz Global Investors GmbH acting on behalf of Allianz AVM-B PIMCO
      Non-Financial Corporates

(22)  Allianz Global Investors GmbH acting on behalf of Allianz ALD Pimco Non
      Financial Corporates

(23)  Allianz Global Investors GmbH acting on behalf of Allianz APAV Pimco
      Corporates

(24)  Allianz Global Investors GmbH acting on behalf of Allianz SDR Fonds

(25)  Allianz Global Investors GmbH acting on behalf of Allianz ALD Pimco Euro
      Aggregate

(26)  Allianz Global Investors GmbH acting on behalf of Allianz VKRD Pimco Direkt

(27)  Allianz Global Investors GmbH acting on behalf of Allianz ALD PIMCO Direkt

(28)  Allianz Global Investors GmbH acting on behalf of Allianz PV-RD Pimco Direkt

(29)  Allianz Global Investors GmbH acting on behalf of Allianz AADB Pimco Euro
      Aggregate

(30)  Allianz Global Investors GmbH acting on behalf of Allianz UGD 1 Sub
      Gov/Covered

(31)  Allianz Global Investors GmbH acting on behalf of Allianz AKR PIMCO Euro
      Aggregate

(32)  Allianz Global Investors GmbH acting on behalf of Allianz Re Asia EUR Fund

(33)  Allianz Global Investors GmbH acting on behalf of Allianz VGI 1 Pimco Euro
      Aggregate

(34)    Allianz Global Investors GmbH acting on behalf of Allianz ALIK Non Financial
        Corporates

(35)    Allianz Global Investors GmbH acting on behalf of Allianz ALIK Pimco
        Corporates

(36)    Allianz Global Investors GmbH acting on behalf of Allianz APAV PIMCO Direkt

18.    Plaintiff Allianz Life Insurance Company of North America ("Allianz North America") is a Minnesota life insurance company organized under the laws of Minnesota with its principal place of business in Golden Valley, Minnesota.  During the Relevant Period, PIMCO served as Allianz North America's investment manager for its PIMCO-managed investments. PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Allianz North America's PIMCO-managed investments in Petrobras Securities.

19.    Plaintiff Allianz Retirement Plan – Property/Casualty ("Allianz Retirement") is a retirement plan established pursuant to the Employee Retirement Income Security Act of 1974 with its principal place of business in Novato, California.  During the Relevant Period, PIMCO served as Allianz Retirement's investment manager for its PIMCO-managed investments. PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Allianz Retirement's PIMCO-managed investments in Petrobras Securities.

20.    Plaintiffs Aon Hewitt Group Trust for the Long Credit Bond Fund and Aon Hewitt Group Trust for the Intermediate Credit Bond Fund (together, "Aon Hewitt") are trusts with their principal place of business in Chicago, Illinois.  During the Relevant Period, PIMCO served as Aon Hewitt's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Aon Hewitt's PIMCO-managed investments in Petrobras Securities.

21.     Plaintiffs Blue Cross Blue Shield of Minnesota, Inc. and MII Life, Inc. are corporations organized under the laws of Minnesota with their principal places of business in Eagan, Minnesota.  During the Relevant Period, PIMCO served as Blue Cross Blue Shield of Minnesota, Inc.'s investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Blue Cross Blue Shield of Minnesota Inc.'s PIMCO-managed investments in Petrobras Securities.  During the Relevant Period, John Orner served as MII Life, Inc.'s investment manager and had full authority to make and manage, and was responsible for making and managing, MII Life, Inc.'s investments in Petrobras Securities.

22.     Plaintiffs The Boeing Company Employee Retirement Plans Master Trust and The Boeing Company Employee Savings Plans Master Trust (collectively, the "Boeing Retirement Trusts") are trusts established by The Boeing Company.  During the Relevant Period, PIMCO served as the Boeing Retirement Trusts' investment manager for their PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' PIMCO-managed investments in Petrobras Securities.  During the Relevant Period, The Principal Financial Group ("Principal") served as the Boeing Retirement Trusts' investment manager for their Principal-managed investments.  Principal's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' Principal-managed investments in Petrobras Securities.  During the Relevant Period, Western Asset Management Company ("Western Asset") served as the Boeing Retirement Trusts' investment manager for their Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, the

Boeing Retirement Trusts' Western Asset-managed investments in Petrobras Securities. During the Relevant Period, Wellington Management Company LLP ("Wellington") served as the Boeing Retirement Trusts' investment manager for their Wellington-managed investments. Wellington's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' Wellington-managed investments in Petrobras Securities. During the Relevant Period, Legal & General Investment Management America ("L&G") served as the Boeing Retirement Trusts' investment manager for their L&G-managed investments. L&G's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' L&G-managed investments in Petrobras Securities. During the Relevant Period, Goldman Sachs Asset Management ("GSAM") served as the Boeing Retirement Trusts' investment manager for their GSAM-managed investments. GSAM's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' GSAM-managed investments in Petrobras Securities. During the Relevant Period, BlackRock, Inc. ("BlackRock") served as the Boeing Retirement Trusts' investment manager for their BlackRock-managed investments. BlackRock's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' BlackRock-managed investments in Petrobras Securities. During the Relevant Period, Jennison Associates LLC ("Jennison") served as the Boeing Retirement Trusts' investment manager for their Jennison-managed investments. Jennison's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' Jennison-managed investments in Petrobras Securities. During the Relevant Period, J.P. Morgan Investment Management, Inc. ("J.P. Morgan") served as the Boeing Retirement Trusts'

investment manager for their J.P. Morgan-managed investments.  J.P. Morgan's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' J.P. Morgan-managed investments in Petrobras Securities.  During the Relevant Period, Baillie Gifford Overseas Ltd. ("Baillie Gifford") served as the Boeing Retirement Trusts' investment manager for their Baillie Gifford-managed investments.  Baillie Gifford's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' Baillie Gifford-managed investments in Petrobras Securities.  During the Relevant Period, Oaktree Capital Management, L.P. ("Oaktree") served as the Boeing Retirement Trusts' investment manager for their Oaktree-managed investments.  Oaktree's investment managers had full authority to make and manage, and were responsible for making and managing, the Boeing Retirement Trusts' Oaktree-managed investments in Petrobras Securities.  During the Relevant Period, in addition to the above eleven investment managers, the Boeing Retirement Trusts employed numerous other investment managers to invest on the Boeing Retirement Trusts' behalf.  These investment managers include those listed in the Appendix.

23.     Plaintiff Cummins Inc. and Affiliates Collective Investment Trust ("Cummins") is a trust established by Cummins Inc. with its principal place of business in Columbus, Indiana. During the Relevant Period, Reams Asset Management ("Reams") served as Cummins's investment manager for its Reams-managed investments.  As such, Reams's investment managers had full authority to make and manage, and were responsible for making and managing, Cummins's Reams-managed investments in Petrobras Securities.

24.     Plaintiffs Desjardins Floating Rate Income Fund and Desjardins Global Tactical Bond Fund (collectively, the "Desjardins Funds") are mutual funds managed by Desjardins

Investments Inc., a corporation organized under the laws of Québec with its principal place of business in Montréal, Québec.  During the Relevant Period, PIMCO served as one of the Desjardins Funds' investment managers.  In that role, PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, the Desjardins Funds' PIMCO-managed investments in Petrobras Securities.

25.     Plaintiff FCA US LLC Master Retirement Trust ("FCA") is a trust organized under the laws of New York with its principal place of business in Boston, Massachusetts. During the Relevant Period, PIMCO served as FCA's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's PIMCO-managed investments in Petrobras Securities.  During the Relevant Period, BlackRock served as FCA's investment manager for its BlackRock-managed investments.  BlackRock's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's BlackRock-managed investments in Petrobras Securities.  During the Relevant Period, Dodge & Cox ("D&C") served as FCA's investment manager for its D&C-managed investments.  D&C's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's D&C-managed investments in Petrobras Securities.  During the Relevant Period, Jennison served as FCA's investment manager for its Jennison-managed investments. Jennison's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's Jennison-managed investments in Petrobras Securities.  During the Relevant Period, J.P. Morgan served as FCA's investment manager for its J.P. Morgan-managed investments.  J.P. Morgan's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's J.P. Morgan-managed

investments in Petrobras Securities.  During the Relevant Period, L&G served as FCA's investment manager for its L&G-managed investments.  L&G's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's L&G-managed investments in Petrobras Securities.  During the Relevant Period, Western Asset served as FCA's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, FCA's Western Asset-managed investments in Petrobras Securities.

26.     Plaintiff FDP Global Fixed Income Portfolio ("Financière des professionnels") is an investment fund managed by Professionals' Financial – Mutual Funds Inc., a corporation organized under the laws of Québec, with its principal place of business in Montréal, Québec. During the Relevant Period, PIMCO served as Financière des professionnels' investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Financière des professionnels' PIMCO-managed investments in Petrobras Securities.

27.     Plaintiff Fireman's Fund Insurance Company ("Fireman's Fund") is a corporation organized under the laws of California with its principal place of business in Novato, California. During the Relevant Period, PIMCO served as Fireman's Fund's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Fireman's Fund's PIMCO-managed investments in Petrobras Securities .

28.     Plaintiff Fubon Life Insurance Company Limited ("Fubon") is a corporation organized under the laws of Taiwan, Republic of China with its principal place of business in Taipei, Taiwan.  During the Relevant Period, Fubon managed some of its Petrobras investments

internally.  For these Petrobras investments, Fubon's investment managers made and managed
the trading in Petrobras Securities.  In addition, during the Relevant Period, PIMCO served as
Fubon's investment manager for its PIMCO-managed investments.  PIMCO's investment
managers had full authority to make and manage, and were responsible for making and
managing, Fubon's PIMCO-managed investments in Petrobras Securities.  During the Relevant
Period, J.P. Morgan served as Fubon's investment manager for its J.P. Morgan-managed
investments.  J.P. Morgan's investment managers had full authority to make and manage, and
were responsible for making and managing, Fubon's J.P. Morgan-managed investments in
Petrobras Securities.  During the Relevant Period, Deutsche Asset & Wealth Management
("Deutsche Bank") served as Fubon's investment manager for its Deutsche Bank-managed
investments.  Deutsche Bank's investment managers had full authority to make and manage, and
were responsible for making and managing, Fubon's Deutsche Bank-managed investments in
Petrobras Securities.

29.     Plaintiff The Glencore Canada Pension Funds Trust – Bond Fund ("Glencore") is
an investment vehicle for defined benefit pension plans sponsored by Glencore Canada
Corporation, with its principal place of business in Toronto, Ontario.  During the Relevant
Period, PIMCO served as Glencore's investment manager for its PIMCO-managed investments.
PIMCO's investment managers had full authority to make and manage, and were responsible for
making and managing, Glencore's PIMCO-managed investments in Petrobras Securities.

30.     Plaintiff The Guardian Life Insurance Company of America is a mutual life
insurance company organized under the laws of New York with its principal place of business in
New York, New York.  Plaintiff The Guardian Life Insurance Company of America Master
Pension Trust is a trust organized under the laws of New York with its principal place of

business in New York, New York.  Plaintiff The Guardian Insurance and Annuity Company, Inc. is an insurance company organized under the laws of Delaware with its principal place of business in New York.  Plaintiff Berkshire Life Insurance Company of America (together with The Guardian Life Insurance Company of America, The Guardian Life Insurance Company of America Master Pension Trust, and The Guardian Insurance and Annuity Company, Inc., "Guardian") is an insurance company organized under the laws of Massachusetts with its principal place of business in Massachusetts.  During the Relevant Period, PIMCO served as Guardian's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Guardian's PIMCO-managed investments in Petrobras Securities.  During the Relevant Period, Robert Crimmins served as Guardian's investment manager for its non-PIMCO-managed investments in Petrobras Securities.  Mr. Crimmins had full authority to make and manage, and was responsible for making and managing, Guardian's non-PIMCO-managed investments in Petrobras Securities.

31.    Plaintiffs Harbor Commodity Real Return Strategy Fund and Harbor Emerging Markets Equity Fund are investment funds managed by Harbor Capital Advisors, Inc., a corporation organized under the laws of Delaware with its principal place of business in Chicago, Illinois.  Plaintiff Harbor Capital Group Trust for the Defined Benefit Plan (together with Harbor Commodity Real Return Strategy Fund and Harbor Emerging Markets Equity Fund, "Harbor") is a qualified defined benefit pension plan sponsored by Harbor Capital Advisors, Inc. During the Relevant Period, PIMCO served as Harbor's investment manager for their PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Harbor's PIMCO-managed investments in

Petrobras Securities.  During the Relevant Period, Jennison served as Harbor's investment

manager for its Jennison-managed investments.  Jennison's investment managers had full

authority to make and manage, and were responsible for making and managing, Harbor's

Jennison-managed investments in Petrobras Securities.  During the Relevant Period, Oaktree

served as Harbor's investment manager for its Oaktree-managed investments.  Oaktree's

investment managers had full authority to make and manage, and were responsible for making

and managing, Harbor's Oaktree-managed investments in Petrobras Securities.

33.     Plaintiffs Ingersoll-Rand Company Collective Trust and Trane Pension Plan

Master Trust (collectively, "Ingersoll-Rand") are trusts established by the Ingersoll-Rand

Company and Trane U.S. Inc., respectively.  During the Relevant Period, PIMCO served as

Ingersoll-Rand's investment manager for its PIMCO-managed investments.  PIMCO's

investment managers had full authority to make and manage, and were responsible for making

and managing, Ingersoll-Rand's PIMCO-managed investments in Petrobras Securities.  During

the Relevant Period, D&C served as Ingersoll-Rand's investment manager for its D&C-managed

investments.  D&C's investment managers had full authority to make and manage, and were

responsible for making and managing, Ingersoll-Rand's D&C-managed investments in Petrobras

Securities.

33.     Plaintiff National Pension Services ("NPS") is a company established under the

laws of South Korea with its principal place of business in Seoul, South Korea.  During the

Relevant Period, PIMCO served as NPS's investment manager for its PIMCO-managed

investments.  PIMCO's investment managers had full authority to make and manage, and were

responsible for making and managing, NPS's PIMCO-managed investments in Petrobras

Securities.

21

34.     Plaintiff New Ships, Inc. Pension Master Trust ("HII") is a trust established pursuant to the Employee Retirement Income Security Act of 1974 with its principal place of business in Quincy, Massachusetts.  During the Relevant Period, PIMCO served as HII's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, HII's PIMCO-managed investments in Petrobras Securities.  During the Relevant Period, BlackRock served as HII's investment manager for its BlackRock-managed investments.  BlackRock's investment managers had full authority to make and manage, and were responsible for making and managing, HII's BlackRock-managed investments in Petrobras Securities.  During the Relevant Period, GSAM served as HII's investment manager for its GSAM-managed investments.  GSAM's investment managers had full authority to make and manage, and were responsible for making and managing, HII's GSAM-managed investments in Petrobras Securities.  During the Relevant Period, Jennison served as HII's investment manager for its Jennison-managed investments.  Jennison's investment managers had full authority to make and manage, and were responsible for making and managing, HII's Jennison-managed investments in Petrobras Securities.

35.     Plaintiffs Nova Scotia Public Service Superannuation Fund and Nova Scotia Teachers' Pension Fund (collectively, "Nova Scotia Pension Services") are public pension funds, the investments of which are managed by the Nova Scotia Pension Services Corporation, a corporation organized under the laws of Nova Scotia with its principal place of business in Halifax, Nova Scotia.  During the Relevant Period, PIMCO served as Nova Scotia Pension Services' investment manager for its PIMCO-managed investments.  PIMCO's investment

managers had full authority to make and manage, and were responsible for making and managing, Nova Scotia Pension Services' PIMCO-managed investments in Petrobras Securities.

36.     Plaintiff RBC Canadian Master Trust is a trust organized under the laws of Ontario with its principal place of business in Toronto, Ontario. During the Relevant Period, PIMCO served as RBC Canadian Master Trust's investment manager for its PIMCO-managed investments. PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, RBC Canadian Master Trust's PIMCO-managed investments in Petrobras Securities.

37.     Plaintiff Roche U.S. Retirement Plans Master Trust ("Roche") is a trust organized under the laws of New Jersey with its principal place of business in Little Falls, New Jersey. During the Relevant Period, PIMCO served as one of Roche's investment managers. In that role, PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Roche's PIMCO-managed investments in Petrobras Securities.

38.     Plaintiffs PIMCO Emerging Markets Currency Collective Trust, PIMCO Total Return Collective Trust, PIMCO RealEstatePLUS Collective Trust, PIMCO CommoditiesPLUS Collective Trust, and PIMCO Global Advantage Strategy Collective Trust (collectively, "SEI Trust") are all sub-funds of the PIMCO Collective Investment Trust, each of which is a bank-maintained collective investment trust sponsored by the SEI Trust Company under the laws of Pennsylvania, with their principal place of business in Oaks, Pennsylvania. During the Relevant Period, PIMCO served as SEI Trust's investment advisor with delegated authority to invest the SEI Trusts' assets in accordance with the terms of such delegation. PIMCO's investment managers had full authority to make and manage, and were responsible for making and

managing, SEI Trust's PIMCO-managed investments in Petrobras Securities pursuant to the terms of such delegation.

39.     Plaintiff Interventure Fixed Income Investments Limited ("Interventure Capital") is a Cayman Islands company with its principal place of business in Grand Cayman.  During the Relevant Period, PIMCO served as Interventure Capital's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Interventure Capital's PIMCO-managed investments in Petrobras Securities.  During the Relevant Period, Loomis, Sayles & Company ("Loomis Sayles") served as Interventure Capital's investment manager for its Loomis Sayles-managed investments.  Loomis Sayles's investment managers had full authority to make and manage, and were responsible for making and managing, Interventure Capital's Loomis Sayles-managed investments in Petrobras Securities.

40.     Plaintiff Stichting Bedrijfspensioenfonds voor de Agrarische en Voedselvoorzieningshandel ("Bpf AVH") is a limited liability Dutch foundation organized under the laws of The Netherlands, with its principal place of business in Rijswijk, The Netherlands. During the Relevant Period, PIMCO served as Bpf AVH's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Bpf AVH's PIMCO-managed investments in Petrobras Securities.

41.     Western Asset is an investment management firm headquartered in Pasadena, California.  Western Asset and its affiliates sponsor hundreds of investment funds, including the following Plaintiff funds:

(1)     Western Asset Total Return Unconstrained (TRU) Bond Master Fund, Ltd

(2)     Western Asset Emerging Markets Corporate Credit Securities Portfolio, L.L.C.

(3)  Western Asset US Long Duration, LLC

(4)  Western Asset Macro Opportunities Portfolio Master

(5)  Western Asset Global Multi Sector, LLC

(6)  Western Asset US Core Plus, LLC

(7)  Legg Mason Western Asset Macro Opportunities Bond Fund

(8)  Legg Mason Western Asset Global Multi Strategy Fund

(9)  Legg Mason Global Funds PLC, Western Asset Emerging Market Corporate Bond Fund

(10)  Legg Mason Western Asset Emerging Markets Total Return Bond Fund

(11)  Legg Mason Western Asset Global Core Plus Bond Fund

(12)  Western Asset Income Fund

(13)  Western Asset Core Plus Bond Fund

(14)  Western Asset Core Bond Fund

(15)  Western Asset Total Return Unconstrained Fund (FKA: Absolute Return)

(16)  Western Asset Macro Opportunities Fund

(17)  Western Asset Intermediate Bond Fund

(18)  Western Asset High Yield Fund

(19)  Western Asset Premier Bond Fund

(20)  Western Asset US Intermediate Plus, LLC

(21)  Western Asset/Claymore U.S. Treasury Inflation Protected Securities Fund

(22)  Western Asset Emerging Markets Debt Fund Inc.

(23)  Western Asset Emerging Markets Income Fund II Inc.

(24)  Western Asset Worldwide Income Fund, Inc.

(25)  Western Asset High Income Fund II, Inc.

(26)  Western Asset High Income Opportunity Fund Inc.

(27)  Western Asset Investment Grade Defined Opportunity Trust Inc.

(28)   Western Asset Global High Income Fund, Inc.

(29)   Western Asset Managed High Income Fund, Inc.

(30)   Western Asset Global Corporate Defined Opportunity Fund, Inc.

(31)   Western Asset High Yield Defined Opportunity Fund Inc

(32)   Western Asset Global Partners Income Fund Inc.

(33)   Western Asset Variable Rate Strategic Fund, Inc.

(34)   Western Asset Emerging Markets Debt Fund

(35)   Western Asset SMASh Series C Fund

(36)   Western Asset Corporate Bond Fund

(37)   Western Asset SMASh Series EC Fund

(38)   Western Asset Global Strategic Income Fund

(39)   Western Asset Adjustable Rate Income Fund

(40)   Western Asset Core Plus VIT Portfolio

(41)   Western Asset Variable Global High Yield Bond Portfolio

(42)   Western Asset Global High Yield Bond Fund

(43)   Legg Mason Western Asset US Core Bond Fund

(44)   Western Asset US Core Bond, LLC

(45)   Legg Mason Western Asset Global High Yield Bond Fund

(46)   Legg Mason Western Asset US Core Plus Bond Fund

(47)   Western Asset Strategic US$ High Yield Portfolio, LLC

(48)   Western Asset Macro Opportunities Alternatives Fund, Ltd

(49)   Western Asset/Claymore U.S. Treasury Inflation Protected Securities Fund 2

(50)   Legg Mason Western Asset Global Credit Fund

(51)   Legg Mason Western Asset Euro High Yield Fund

(52)   Legg Mason IF Western Asset Global Multi Strategy Bond Fund

(53)   Legg Mason Western Asset Global Credit Absolute Return Fund

42.   Plaintiff Ashwood Investments Limited ("Ashwood") is a limited liability company organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.  During the Relevant Period, Western Asset served as Ashwood's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, Ashwood's Western Asset-managed investments in Petrobras Securities.

43.   Plaintiff Baha'i  World Centre ("BWC") is a religious organization organized under the laws of Israel with its principal place of operations in Haifa, Israel.  During the Relevant Period, Western Asset served as BWC's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, BWC's Western Asset-managed investments in Petrobras Securities.  During the Relevant Period, PIMCO served as BWC's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, BWC's PIMCO-managed investments in Petrobras Securities.

44.   Plaintiff Cathay Multi-Strategy High-Yield Bond Fund ("Cathay") is a fund managed by Cathay Securities Investment Trust Co. Ltd. under the laws of Taiwan with its principal place of business in Taiwan.  During the Relevant Period, Western Asset served as Cathay's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, Cathay's Western Asset-managed investments in Petrobras Securities.

45.   Plaintiff Con-way Retirement Master Trust ("Con-way") is a trust that holds or held the assets of multiple retirement plans established pursuant to the Employee Retirement

27

Income Security Act of 1974.  The plans' named fiduciary is the Con-way Inc. Administrative Committee, whose principal place of business is in Portland Oregon.  The Con-way Inc. Administrative Committee was created by Con-way Inc., a Delaware corporation with its principal place of business in Ann Arbor, Michigan.  During the Relevant Period, Western Asset served as Con-way's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, Con-way's Western Asset-managed investments in Petrobras Securities.  During the Relevant Period, PIMCO served as Con-way's investment manager for its PIMCO-managed investments.  PIMCO's investment managers had full authority to make and manage, and were responsible for making and managing, Con-way's PIMCO-managed investments in Petrobras Securities.

46.     Plaintiff Hand Benefits & Trust Company is a state-chartered trust company organized under the laws of Texas with its principal place of business in Houston, Texas.  Hand Benefits & Trust Company sponsors Plaintiff Hand Composite Employee Benefit Trust (together with Hand Benefits & Trust Company, "Hand").  During the Relevant Period, Western Asset served as Hand's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, Hand's Western Asset-managed investments in Petrobras Securities.

47.     Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals are public-benefit corporations headquartered in Oakland, California.  Plaintiff Kaiser Foundation Health Plan of Colorado (together with Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals, "Kaiser") is a public-benefit corporation with principal offices in Oakland, California and Denver, Colorado.  During the Relevant Period, Western Asset served

as Kaiser's investment manager for its Western Asset-managed investments.  Western Asset's

investment managers had full authority to make and manage, and were responsible for making

and managing, Kaiser's Western Asset-managed investments in Petrobras Securities.  During the

Relevant Period, D&C served as Kaiser's investment manager for its D&C-managed

investments.  D&C's investment managers had full authority to make and manage, and were

responsible for making and managing, Kaiser's D&C-managed investments in Petrobras

Securities.  During the Relevant Period, J.P. Morgan served as Kaiser's investment manager for

its J.P. Morgan-managed investments.  J.P. Morgan's investment managers had full authority to

make and manage, and were responsible for making and managing, Kaiser's J.P. Morgan-

managed investments in Petrobras Securities.  During the Relevant Period, GSAM served as

Kaiser's investment manager for its GSAM-managed investments.  GSAM's investment

managers had full authority to make and manage, and were responsible for making and

managing, Kaiser's GSAM-managed investments in Petrobras Securities.  During the Relevant

Period, BlackRock served as Kaiser's investment manager for its BlackRock-managed

investments.  BlackRock's investment managers had full authority to make and manage, and

were responsible for making and managing, Kaiser's BlackRock-managed investments in

Petrobras Securities.  During the Relevant Period, Loomis Sayles served as Kaiser's investment

manager for its Loomis Sayles-managed investments.  Loomis Sayles's investment managers had

full authority to make and manage, and were responsible for making and managing, Kaiser's

Loomis Sayles-managed investments in Petrobras Securities.  During the Relevant Period, Wells

Capital Management ("Wells") served as Kaiser's investment manager for its Wells-managed

investments.  Wells's investment managers had full authority to make and manage, and were

responsible for making and managing, Kaiser's Wells-managed investments in Petrobras Securities.

48.     Plaintiffs Kuwait Investment Authority, Kuwait Investment Authority - Global Bond Ex-US (Fixed Income) Core, and Kuwait Investment Authority - Global Bond Opportunistic Portfolio (together, "KIA") are sovereign wealth funds.  KIA is an independent public investment authority established pursuant to Law No. 47 of 1982 in the State of Kuwait with its principal place of business in Al Asimah, Kuwait.  During the Relevant Period, Western Asset served as KIA's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, KIA's Western Asset-managed investments in Petrobras Securities. During the Relevant Period, in addition to Western Asset, KIA employed numerous other investment managers to invest on its behalf.  These investment managers include those listed in the Appendix.

49.     Plaintiff Marshfield Clinic Master Trust for the Employees' Retirement Plan and Salary Reduction/401(k) Plan ("Marshfield") is a retirement plan established pursuant to the Employee Retirement Income Security Act of 1974 with its principal place of business in Marshfield, Wisconsin.  During the Relevant Period, Western Asset served as Marshfield's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, Marshfield's Western Asset-managed investments in Petrobras Securities.  During the Relevant Period, Aberdeen Asset Management Inc. ("Aberdeen") served as Marshfield's investment manager for its Aberdeen-managed investments.  Aberdeen's investment managers

had full authority to make and manage, and were responsible for making and managing, Marshfield's Aberdeen-managed investments in Petrobras Securities.

50.     Plaintiff Oklahoma Tobacco Settlement Endowment Trust Fund ("OTSET") is a public trust and grant making state agency created by the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  During the Relevant Period, Western Asset served as OTSET's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, OTSET's Western Asset-managed investments in Petrobras Securities.

51.     Plaintiff PCS Administration Master Pension Trust ("PCS") is a retirement plan established pursuant to the Employee Retirement Income Security Act of 1974 and sponsored by PCS Administration (USA), Inc., which is a Delaware corporation with its principal place of business in Northbrook, Illinois.  During the Relevant Period, Western Asset served as PCS's investment manager for its Western Asset-managed investments.  Western Asset's investment managers had full authority to make and manage, and were responsible for making and managing, PCS's Western Asset-managed investments in Petrobras Securities.

*     *     *

52.     The above Plaintiffs purchased Petrobras Securities that are the subject of this action, including those identified in the Appendix.  The Appendix is a non-exclusive and preliminary list of the purchase transactions being pursued in this case; the list may change as the action progresses and more information becomes known, and Plaintiffs reserve the right to modify, add to, or subtract from the entries in the Appendix.  For each purchase identified, the Appendix shows the relevant Plaintiff, its investment manager, the relevant Committee on Uniform Securities Identification Procedures ("CUSIP") number or International Securities

31

Identification Number ("ISIN") for the security, the purchase date, quantity, and price, as well as the location of the purchase.

53.     During the Relevant Period, PIMCO investment managers made investment decisions on behalf of the PIMCO-sponsored funds (as described in paragraph 15 above) and the other Plaintiffs' PIMCO-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where PIMCO conducted these activities for each of the listed purchases of Petrobras Securities.

54.     During the Relevant Period, Aberdeen made investment decisions in Petrobras ADSs on behalf of Plaintiffs' Aberdeen-managed investments.  Aberdeen traded the Petrobras ADSs on U.S. securities exchanges.

55.     During the Relevant Period, Baillie Gifford made investment decisions in Petrobras ADSs on behalf of Plaintiffs' Baillie Gifford-managed investments.  Baillie Gifford traded the Petrobras ADSs on U.S. securities exchanges.

56.     During the Relevant Period, BlackRock investment managers made investment decisions on behalf of Plaintiffs' BlackRock-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where BlackRock conducted these activities for each of the listed purchases of Petrobras Securities.

57.     During the Relevant Period, Mr. Robert Crimmins made investment decisions on behalf of Guardian's non-PIMCO managed investments.  Mr. Crimmins made these decisions in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound Guardian in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where Mr. Crimmins conducted these activities for each of the listed purchases of Petrobras Securities.

58.     During the Relevant Period, D&C investment managers made investment decisions on behalf of Plaintiffs' D&C-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where D&C conducted these activities for each of the listed purchases of Petrobras Securities.

59.     During the Relevant Period, GSAM investment managers made investment decisions on behalf of Plaintiffs' GSAM-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where GSAM conducted these activities for each of the listed purchases of Petrobras Securities.

60.     During the Relevant Period, Jennison investment managers made investment decisions on behalf of Plaintiffs' Jennison-managed investments.  These managers were located

in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where Jennison conducted these activities for each of the listed purchases of Petrobras Securities.

61.     During the Relevant Period, J.P. Morgan investment managers made investment decisions on behalf of Plaintiffs' J.P. Morgan-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where J.P. Morgan conducted these activities for each of the listed purchases of Petrobras Securities.

62.     During the Relevant Period, L&G investment managers made investment decisions on behalf of Plaintiffs' L&G-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where L&G conducted these activities for each of the listed purchases of Petrobras Securities.

63.     During the Relevant Period, Loomis Sayles investment managers made investment decisions on behalf of Plaintiffs' Loomis Sayles-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to

take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States. The Appendix provides the location where Loomis Sayles conducted these activities for each of the listed purchases of Petrobras Securities.

64. During the Relevant Period, Mr. John Orner made investment decisions on behalf of MII Life, Inc. Mr. Orner was located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound MII Life, Inc. in the United States to take the Petrobras Securities, and executed the trades in Petrobras Securities in the United States. The Appendix provides the location where Mr. Orner conducted these activities for each of the listed purchases of Petrobras Securities.

65. During the Relevant Period, Oaktree investment managers made investment decisions on behalf of Plaintiffs' Oaktree-managed investments. These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States. The Appendix provides the location where Oaktree conducted these activities for each of the listed purchases of Petrobras Securities.

66. During the Relevant Period, Principal investment managers made investment decisions on behalf of Plaintiffs' Principal-managed investments. These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States. The Appendix provides the location where Principal conducted these activities for each of the listed purchases of Petrobras Securities.

67.     During the Relevant Period, Reams investment managers made investment decisions on behalf of Plaintiffs' Reams-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where Reams conducted these activities for each of the listed purchases of Petrobras Securities.

68.     During the Relevant Period, Wellington investment managers made investment decisions on behalf of Plaintiffs' Wellington-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where Wellington conducted these activities for each of the listed purchases of Petrobras Securities.

69.     During the Relevant Period, Wells investment managers made investment decisions on behalf of Plaintiffs' Wells-managed investments.  These managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States.  The Appendix provides the location where Wells conducted these activities for each of the listed purchases of Petrobras Securities.

70.     During the Relevant Period, Western Asset investment managers made investment decisions on behalf of Plaintiffs' Western Asset-managed investments.  These

managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the relevant Plaintiff in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States. The Appendix provides the location where Western Asset conducted these activities for each of the listed purchases of Petrobras Securities.

71.    In addition to the above investment managers, Plaintiffs' other investment managers during the Relevant Period made investments in Petrobras Securities on behalf of Plaintiffs. These investment managers were located in the United States, placed purchase orders for the Petrobras Securities in the United States and thereby irrevocably bound the client in the United States to take the Petrobras Securities, and executed the trades in the Petrobras Securities in the United States. The Appendix provides the location where these investment managers conducted these activities for each of the listed purchases of Petrobras Securities.

### B.    Defendants

#### 1.    Petrobras, PGF, and PifCo

72.    Defendant Petrobras is a corporation organized under Brazilian law. Its principal executive offices are located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil. Petrobras also has an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.

73.    Petrobras is an integrated oil and gas company that was incorporated in 1953 to conduct the Brazilian federal government's hydrocarbon activities. The Company carries out crude oil and natural gas production and refining activities on behalf of the Brazilian government. Petrobras is one of the largest companies in Latin America, and as of December 31, 2014 the Brazilian federal government owned 50.26% of Petrobras's voting shares.

74.     Petrobras's operations account for the majority of Brazil's oil and gas production. Petrobras operates substantially all of the refining capacity in Brazil and participates in most aspects of the Brazilian natural gas market.  The Company's revenue-generating activities are organized into five business segments: (1) exploration and production; (2) refining, transportation and marketing; (3) gas and energy; (4) distribution; and (5) international.  The Company has additional non-revenue generating divisions, such as the services division.  During the Relevant Period, the services division was responsible for designing and overseeing the construction and development of Petrobras's large-scale capital projects, including the construction of new refineries.

75.     Petrobras has stated in SEC filings that its "most important tangible assets" were reported on its balance sheet as property, plant, and equipment ("PP&E").  During the Relevant Period, PP&E constituted the majority of the Company's assets.

76.     Defendant PGF is a wholly-owned finance subsidiary of Petrobras incorporated in The Netherlands.  Its principal executive office is located at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  Petrobras unconditionally guaranteed PGF's publicly issued debt.

77.     Defendant PifCo was a wholly-owned finance subsidiary of Petrobras.  Between the beginning of the Relevant Period and August 9, 2013, PifCo was incorporated in the Cayman Islands with its principal executive office located at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box I 034GT-BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with its principal executive office at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, PifCo spun off certain assets and liabilities to Petrobras.  On February 12, 2014, PGF acquired the

outstanding shares of PifCo as an initial step for the merger of PifCo into PGF.  On December 29, 2014, the merger of PifCo into PGF was completed and PifCo's separate corporate existence was extinguished.  All allegations against PifCo are made against PGF as the corporate successor of PifCo.  Petrobras unconditionally guaranteed PifCo's publicly issued debt.

### 2.    Individual Defendants

78.    Defendant Maria das Graças Silva Foster ("Foster") served as Petrobras's CEO from February 13, 2012 to February 4, 2015.  During that time, Foster certified and signed the Company's periodic financial reports filed with the SEC and participated in the Company's periodic conference calls with investors.  Among the Company's periodic financial reports filed with the SEC, Foster signed the 2012 Registration Statement (defined below in paragraph 102) and the 2011, 2012, and 2013 Forms 20-F.  Before Foster became CEO, she served as the Company's director of the gas and energy business division.

79.    Defendant José Sergio Gabrielli ("Gabrielli") served as Petrobras's CEO from July 22, 2005 to February 13, 2012.  During the Relevant Period up until February 13, 2012, Gabrielli certified and signed the Company's periodic financial reports filed with the SEC and participated in the Company's periodic conference calls with investors.  Among the Company's periodic financial reports filed with the SEC, Gabrielli signed the 2009 and 2010 Forms 20-F.

80.    Defendant Almir Guilherme Barbassa ("Barbassa") served as Petrobras's Chief Financial Officer ("CFO") during the Relevant Period and signed the Company's periodic financial reports filed with the SEC, including the 2012 Registration Statement and the 2010, 2011, 2012, and 2013 Forms 20-F.

81.    Defendant Josué Christiano Gomes da Silva served as a director of Petrobras during the Relevant Period and signed the 2012 Registration Statement.

82.     Defendant Sílvio Sinedino Pinheiro served as a director of Petrobras during the Relevant Period and signed the 2012 Registration Statement.

83.     Defendant Daniel Lima de Oliveira served as CEO and Chairman of PifCo during the Relevant Period and signed the Company's periodic financial reports filed with the SEC, including the 2012 Registration Statement and the 2010 and 2011 Forms 20-F.

84.     Defendant José Raimundo Brandão Pereira served as a director of PifCo during the Relevant Period and signed the 2012 Registration Statement.

85.     Defendant Sérvio Túlio da Rosa Tinoco served as CFO of PifCo during the Relevant Period and signed certain of the Company's periodic financial reports filed with the SEC, including the 2012 Registration Statement and the 2010 and 2011 Forms 20-F.

86.     Defendant Paulo José Alves served as the Chief Accounting Officer of PifCo during the Relevant Period and signed the 2012 Registration Statement.

87.     Defendant Gustavo Tardin Barbosa served as CEO and a managing director of PGF during the Relevant Period and signed the 2012 Registration Statement.

88.     Defendant Alexandre Quintão Fernandes served as CFO and a managing director of PGF during the Relevant Period and signed the 2012 Registration Statement.

89.     Defendant Marcos Antonio Zacarias served as a managing director of PGF during the Relevant Period and signed the 2012 Registration Statement.

90.     Defendant Cornelis Franciscus Jozef Looman served as a managing director of PGF during the Relevant Period and signed the 2012 Registration Statement.

91.     Defendant Theodore Marshall Helms signed the 2012 Registration Statement.

92.     Defendants identified in paragraphs 78-91 may be referred to as the "Individual Defendants."

40

IV.     **RELEVANT SECURITIES**

A.      **ADS**

93.     Petrobras's ADSs representing the Company's common and preferred equity have been traded on the NYSE since 2000 and 2001, under the ticker symbols "PBR" and "PBR/A," respectively.

B.      **2003 – 2012 Notes**

94.     On August 14, 2002, Petrobras and PifCo filed a registration statement for the offer and sale of up to $8 billion in securities, including debt securities, at indeterminate offering prices.  On December 3, 2003, pursuant to this registration statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $750 million in debt securities paying 8.375% due in 2018 (CUSIP 71645WAH4).

95.     On July 28, 2005, Petrobras and PifCo filed a registration statement for the offer and sale of up to $6.5 billion in securities, including debt securities, at indeterminate offering prices.  On October 6, 2006, pursuant to this registration statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $500 million in debt securities paying 6.125% due in 2016 (CUSIP 71645WAL5).

96.     On December 16, 2006, Petrobras and PifCo filed a registration statement for the offer and sale of an indeterminate amount of securities, including debt securities, at indeterminate offering prices (the "2006 Registration Statement").  On November 1, 2007, pursuant to the 2006 Registration Statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $1 billion in debt securities paying 5.875% due in 2018 (CUSIP 71645WAM3).  On January 11, 2008, Petrobras supplemented the November 2007 issuance with an additional $750 million in debt securities with the same interest rate, maturity date, and CUSIP.

97.     On February 11, 2009, pursuant to the 2006 Registration Statement, Petrobras and PifCo issued a prospectus supplement for the offer and sale of $1.5 billion in debt securities paying 7.875% due in 2019 (CUSIP 71645WAN1).  On July 1, 2009, Petrobras supplemented the February 2009 issuance with an additional $1.25 billion in debt securities with the same interest rate, maturity date, and CUSIP.

98.     On October 30, 2009, pursuant to the 2006 Registration Statement, Petrobras and PifCo filed a prospectus supplement for the offer and sale of $4 billion in debt securities in two different series of notes: (1) a $2.5 billion offering paying 5.750% due in 2020 (CUSIP 71645WAP6); and (2) a $1.5 billion offering paying 6.875% due in 2040 (CUSIP 71645WAQ4).

99.     On December 11, 2009, Petrobras and PifCo filed a registration statement for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "2009 Registration Statement").

100.     On January 27, 2011, pursuant to the 2009 Registration Statement, Petrobras and PifCo filed a prospectus supplement for the offer and sale of $6 billion in debt securities in three series of notes: (1) a $2.5 billion offering paying 3.875% due in 2016 (CUSIP 71645WAT8); (2) a $2.5 billion offering paying 5.375% due in 2021 (CUSIP 71645WAR2); and (3) a $1 billion offering paying 6.750% due in 2041 (CUSIP 71645WAS0).

101.     On February 6, 2012, pursuant to the 2009 Registration Statement, Petrobras and PifCo filed a prospectus supplement (the "2012 Prospectus Supplement" and together with the 2009 Registration Statement, the "2012 Offering Documents") for the offer and sale of $7 billion in debt securities in four different series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 (CUSIP 71645WAR2); (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041

(CUSIP 71645WAS0); (3) $1.25 billion of notes paying 2.875% due in 2015 (CUSIP 71645WAV3); and (4) $1.75 billion of notes paying 3.500% due in 2017 (CUSIP 71645WAU5).

### C.    2013 and 2014 Notes

102.    On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "2012 Registration Statement").  The 2012 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including (1) the combined Petrobras and PifCo Form 20-F for the year ended December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012; and (2) the Petrobras Form 6-K for the six-month periods ended June 30, 2012 and 2011.

#### 1.    2013 Note Offering

103.    On May 13, 2013, Petrobras issued a press release announcing the issuance of $11 billion in debt securities to be issued by PGF.  On May 20, 2013, PGF filed a prospectus supplement for the offer and sale of six series of notes pursuant to the 2012 Registration Statement (the "2013 Prospectus Supplement" and together with the 2012 Registration Statement, the "2013 Offering Documents"): (1) $1.25 billion of notes paying 2.000% due in 2016 to be sold at $995.84 per $1,000 par value (CUSIP 71647NAC3); (2) $2 billion of notes paying 3.000% due in 2019 to be sold at $993.52 per $1,000 par value (CUSIP 71647NAB5); (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1,000 par value (CUSIP 71647NAF6); (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1,000 par value (CUSIP 71647NAA7); (5) $1.4 billion of floating-rate notes due in 2016 to be sold at par (CUSIP 71647NAD1); and (6) $1.5 billion of floating-rate notes due 2019 to be sold at par (CUSIP 71647NAE9) (collectively, the "2013 Notes").

43

104.     In addition to the documents incorporated by the 2012 Registration Statement, the

2013 Prospectus Supplement incorporated by reference, among other documents, the Company's

Form 20-F for the year ended December 31, 2012 filed with the SEC on April 29, 2013, which

included descriptions of Petrobras, its asset values, expenses, net income, and internal controls.

### 2.     2014 Note Offering

105.     On March 10, 2014, Petrobras issued a press release announcing the issuance of

$8.5 billion in debt securities to be issued by PGF.  On March 11, 2014, PGF filed a prospectus

supplement for the offer and sale of six series of notes pursuant to the 2012 Registration

Statement (the "2014 Prospectus Supplement" and together with the 2012 Registration

Statement, the "2014 Offering Documents"): (1) $1.6 billion of notes paying 3.250% due in 2017

to be sold at $999.57 per $1,000 par value (CUSIP 71647NAG4); (2) $1.5 billion of notes paying

4.875% due in 2020 to be sold at $997.43 per $1,000 par value (CUSIP 71647NAH2);

(3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1,000 par value

(CUSIP 71647NAM1); (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66

per $1,000 par value (CUSIP 71647NAK5); (5) $1 billion of floating-rate notes due in 2017 to

be sold at par (CUSIP 71647NAJ8); and (6) $500 million of floating-rate notes due 2020 to be

sold at par (CUSIP 71647NAL3) (collectively, the "2014 Notes").

106.     In addition to the documents incorporated by the 2012 Registration Statement, the

2014 Prospectus Supplement incorporated by reference, among other documents, the Company's

Form 20-F for the year ended December 31, 2012 filed with the SEC on April 29, 2013.  The

2014 Prospectus Supplement also incorporated the Company's press release issued March 7,

2014 regarding the Company's internal controls over financial reporting, which stated:

> Our management has assessed the effectiveness of our internal control over
> financial reporting as of December 31, 2013, based on the criteria established in
> Internal Control-Integrated Framework (1992) issued by the Committee of

Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

### D.    Non-U.S. Dollar Denominated Notes

107.    On December 5, 2011, pursuant to the 2009 Registration Statement, Petrobras and PifCo filed a prospectus supplement for the offer and sale of £700 million in debt securities paying 6.250% due in 2026 (ISIN XS0718502007).

108.    On December 1, 2011, pursuant to the 2009 Registration Statement, Petrobras and PifCo filed a prospectus supplement for the offer and sale of €1.85 billion in debt securities in two series of notes: (1) a €1.25 billion offering paying 4.875% due in 2018 (ISIN XS0716979249); and (2) a €600 million offering paying 5.875% due in 2022 (ISIN XS0716979595).

109.    On September 24, 2012, pursuant to the 2012 Registration Statement, Petrobras and PGF filed a prospectus supplement for the offer and sale of €2 billion in debt securities in two series of notes: (1) a €1.3 billion offering paying 3.250% due in 2019 (ISIN XS0835886598); and (2) a €700 million offering paying 4.250% due in 2023 (ISIN XS0835890350). As part of the same offering, the prospectus supplement announced a £450 million offering paying 5.375% due in 2029 (ISIN XS0835891838).

110.    On January 7, 2014, pursuant to the 2012 Registration Statement, Petrobras and PGF filed a prospectus supplement for the offer and sale of €3.05 billion in debt securities in three series of notes: (1) a €1.5 billion offering paying 2.750% due in 2018 (ISIN XS0982711631); (2) a €750 million offering paying 3.750% due in 2021 (ISIN XS0982711987); and (3) a €800 million offering paying 4.750% due in 2025

(ISIN XS0982711714).  As part of the same offering, the prospectus supplement announced a £600 million offering paying 6.625% due in 2034 (ISIN XS0982711474).

*    *    *

111.    The above securities, as described in paragraphs 93 through 110, are collectively referred to in this complaint as the "Petrobras Securities."

## V.    SUMMARY OF SUBSTANTIVE ALLEGATIONS

### A.    Petrobras's Expanding Need for Capital Investment

112.    Petrobras's business activities required heavy capital investment.  To capitalize on Brazil's oil reserves, Petrobras first had to invest billions of dollars in exploratory drilling, oil rigs, and other infrastructure.

113.    For example, in 2006, Petrobras discovered large oil reserves miles from the Brazilian coast.  These reserves were below an approximately two-kilometer layer of sodium chloride, which itself was below an approximately two-kilometer layer of rock underneath the Atlantic Ocean floor.  These fields are referenced as "pre-salt fields."

114.    The exploration and development of these pre-salt fields was challenging and expensive.  The fields were located 300 kilometers from the Brazilian coast in water greater than two kilometers deep.  Moreover, the area where the pre-salt fields were discovered often experienced severe oceanic conditions.  After drilling an oil well, Petrobras would be required to build or lease floating production, storage, and offloading vessels ("FPSOs").  Then, the Company would have to transport the crude oil to refining facilities.

115.    In the years leading up to 2010, when Petrobras announced that it would explore and develop these pre-salt fields, market analysts were concerned that the Company might become "overwhelmed" with the projects given the complicated financing and project management that would be required by the sprawling developments.  These analysts estimated

that constructing a single pre-salt well would cost between $100 and $150 million and that one significant pre-salt field could require up to 200 wells. Moreover, they estimated that to operate the pre-salt wells, it could cost the Company over $600 billion during the wells' lifetimes.

116. In 2007, as the Company was embarking on exploration and development of the pre-salt fields, it announced plans to build Brazil's first new oil refineries since 1980. Gabrielli (then Petrobras's CEO) stated that the new refineries—specifically, the Abreu e Lima refinery and the Complexo Petroquimico do Rio de Janeiro (the "Abreu Refinery" and "Comperj Refinery," respectively)—would transform Brazil's economy by enabling the country to be self-sufficient in oil refining by 2015.

117. During the same time, Petrobras paid a total of $1.8 billion to purchase a refinery in Pasadena, Texas (the "Pasadena Refinery")—a refinery that was purchased for just $42.5 million one year earlier.

**B.     Rules and Regulations Governing Bidding for Petrobras Contracts**

118. Throughout the Relevant Period, Petrobras hired outside contractors to supply goods and/or services to the Company's various business segments, including those necessary to construct the new refineries. Bidding for contracts was governed by the "Simplified Bidding Procedure Regulations" and the "Petrobras Procurement Manual." These guidelines were intended to encourage open and honest bidding for contracts with the Company. In 2011, in anticipation of the 2014 World Cup and 2016 Olympic Games, Brazil enacted legislation called the "Differential Public Procurement Regime" to streamline procurement bids and contracts at Brazilian companies, including Petrobras.

119. When the Differential Public Procurement Regime was enacted, Petrobras represented that "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct

the procurement process, and those who are responsible for approving it.  We also established limits of authority, updated and approved periodically by the Executive Board, for the signing of contracts."

120.    The Company's services division largely managed Petrobras's procurement processes.  When business segments commissioned new projects for their division, the services division would create the basic design, conduct the bidding process, select the outside contractor(s) to execute the project, and oversee the construction of the project.  Upon completion, the business segment would take over the project.  From 2003 to 2012, Renato Duque headed the services division.  As discussed below, Duque was a central figure in the fraud and bribery schemes.

### C.    Fraud and Bribery Schemes

#### 1.    The "Operation Car Wash" Investigation

121.    In 2009, the Brazilian federal police launched a secret investigation code-named "Lava Jato," or "Car Wash," focused on a scheme run by black-market money dealers, including career criminal and money launderer Alberto Youssef.  The scheme is thought to have transferred and laundered approximately $3.8 billion, using, among other things, the purchase and sale of luxury automobiles.  The investigation became public on or about March 17, 2014.  On or about March 20, 2014, Brazilian police arrested Paulo Costa, a director of Petrobras's refining, transportation and marketing division, but Petrobras continued to deny any wrongdoing or that the investigation would impact its financial reporting until October 27, 2014.

122.    Costa was a member of Petrobras's senior management and the Company's Chief Downstream Officer and Director of Supply from May 14, 2004 through April 2012.  In that position, Costa was the top executive in charge of Petrobras's refining, transportation and marketing division and reported directly to the CEO.  Costa's arrest was based on documentation

linking Costa to another person implicated in the money laundering scheme.  When the police raided Costa's home, they found a stash of R$700,000 in Brazilian currency and $200,000 in U.S. currency.  Costa has admitted to Brazilian prosecutors that he had received R$1.5 million (approximately $636,000) in connection with Petrobras's purchase of the Pasadena Refinery. Eduardo Vaz Costa Musa ("Costa-Musa"), a former manager of Petrobras's international division and a cooperating witness for the ongoing investigations by the Brazilian government, also has confirmed that Petrobras executives received bribes in connection with the purchase of the Pasadena Refinery.  Petrobras's international division was responsible for spearheading the Pasadena Refinery's purchase.

123.    Costa subsequently agreed to cooperate with the prosecutors and has since testified that he turned Petrobras's refining division into a slush fund for the Workers' Party. Pedro Barusco, a former manager in Petrobras's services division, similarly testified at a Brazilian Congressional hearing that the Workers' Party received up to $200 million in payments that were skimmed from Petrobras contracts.  Both Costa and Barusco have testified that the corruption, bribery, and intentional contract inflation at Petrobras was ongoing for more than a decade.  On March 16, 2015, Brazilian prosecutors filed corruption charges against João Vaccari (treasurer of the Workers' Party) arising out of the bribery scheme.

124.    In December 2014, Brazil's Comptroller General initiated cases against eight construction companies with ties to Petrobras; in March 2015, the Comptroller General announced it had opened cases against ten more.  So far, the scheme has implicated at least twenty-three contractors, including some of the largest construction firms in Brazil.  The scheme also has implicated multi-national corporations, including corporations in Singapore, Switzerland, and the United Kingdom.  As of March 2015, there already had been over forty

indictments on racketeering, bribery, and money laundering.  On July 20, 2015, executives of one of Brazil's largest construction companies were convicted on charges related to the Petrobras scandal, the first construction-industry executives to be convicted.  Additionally, prosecutors have asked the Brazilian Supreme Court to investigate dozens of sitting politicians, including the speakers of both houses of the Brazilian Congress, for allegedly receiving bribery money.  On August 20, 2015, Brazilian authorities charged the speaker of Brazil's lower house of Congress and a former Brazilian president with corruption.

### 2.    The Scheme Skewed Bidding to Maximize Profits for Cartel Members

125.    The Operation Car Wash investigation and testimony from cooperating witnesses have revealed that Petrobras was an active participant in a bidding scheme designed to eliminate any type of competitive bidding process and, instead, to award contracts to those bribing Petrobras executives and other government officials.  Costa explained that, because there were only a handful of Brazilian companies with the technical capability and capacity to handle the large-scale projects Petrobras sought to undertake, the companies formed a cartel (the "Cartel") designed to frustrate and render ineffective any competitive bidding process.

126.    According to Costa's testimony, to ensure that contracts were awarded to the Cartel and that bribes were paid to Petrobras executives and other officials, the Cartel adopted the following scheme:

    a.    Each of the Petrobras business segments was assigned a sponsor from a patron political party (known inside Petrobras as a "Padrinho" or Godfather).

    b.    The Godfather would nominate a director for the business segment, whom the Petrobras Board of Directors would then select.

    c.    It was made perfectly clear to each business segment director that the director's job security depended on keeping the Godfather (and the Godfather's political party) happy, which was accomplished by including a 3% kick-back in every major contract.

d.  The scheme would only work, however, if all contractors cooperated.  To gain the contractors' cooperation, the Cartel agreed to establish a committee among the participating members that would decide who would win each contract, equitably rotating the "winners" among members.

e.  The companies agreed that they would coordinate their bids with the respective business segment director.

127.  Before Petrobras opened bidding for a contract, it would calculate the expected cost of supplies and labor.  The Company would then solicit bids for the contract and had a policy to consider reasonable any bids within the range of 15% below and 20% above the internal estimate.

128.  Prior to soliciting bids, however, Petrobras would inform the Cartel of Petrobras's internal cost estimate and the Cartel members would adjust their bids accordingly such that all of the bids came in at or near the 20% ceiling.  According to Barusco (former manager in Petrobras's services division), the Cartel worked "strongly and collectively" to obtain contracts 20% over the Company's internal estimate.  Barusco explained that contracts with the Cartel were always "signed near the maximum amount for the internal budget of Petrobras."  Costa testified that the amounts paid for the works were "much higher than the real values" and that, by virtue of the bribery scheme, the Cartel members were able to "stretch[]" their profits "to the limit the contracting enterprise allow[ed]."

129.  Petrobras was aware of and participated in the Cartel's fixed bidding scheme.  Costa testified that the Petrobras Board of Directors was aware of the scheme from the beginning and never would question the overstated bids.  Petrobras reportedly participated in the Cartel's dealings through periodic meetings with the Brazilian Industrial Engineering Association (Abemi), at which they would negotiate contracts.  Petrobras acted to standardize procedures for contracts with the engineering companies now implicated in Operation Car Wash.  Minutes of certain meetings held at Petrobras headquarters show that Petrobras sent early drafts of

contracts and calls for tender for Abemi's analysis before contracts officially were launched by Petrobras.  In the minutes, Petrobras workers spelled out to the contractors how they should present claims for contract addenda in order to avoid refusal.

130.    Those involved with the scheme described the practice as the "rule of the game." Documents submitted by a Cartel member depict meetings held by the Cartel members before the solicitation process, which were designed to undermine the bidding process.  Among those documents is a table depicting the individual preferences of each Cartel member.  In the table, there is an annotation of upcoming Petrobras projects to be distributed, the name of the contractors (identified by acronyms), and each contractor's preference with regard to the upcoming Petrobras projects.  The Brazilian federal police seized similar documents at another cartel member.  Other documents seized by the Brazilian federal police show a close match between the results of bidding and the contractors' preferences, as depicted in the above mentioned tables.

### 3.    Bribes and Kick-Backs Included in the Petrobras Contracts

131.    The contractors' coordinated overbids included a 3% kick-back paid to Petrobras executives, political parties, and money launderers.  Costa testified that Cartel members would meet regularly in São Paulo or Rio de Janeiro to decide which contract would go to each company and the percentage by which the Cartel's bids would be overstated to cover the necessary bribes and kick-backs.  If any Cartel member failed to include the required 3% kick-back, the Cartel would disqualify the member from future bidding.

132.    Costa testified that, for at least seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."  Costa revealed that a group of

politicians, including members and allies of Rousseff's Workers' Party, had accepted bribes linked to Petrobras contracts.  Costa testified that he personally received tens of millions of dollars in bribes and referred to them as a "three percent political adjustment."

133.    Costa testified that Petrobras was engulfed in a culture of "political patronage," where career advancement was based on cronyism, not merit.  Because the Brazilian government was Petrobras's majority shareholder, all Board of Director nominations, including that of the President, were made by the ruling political parties, with the Workers' Party having the majority of the seats.  Costa testified that he aligned himself with the Partido Progressista (the Progressive Party) and knew that if he were to be selected as a director of a business segment, he would have to meet the Progressive Party's demands or be replaced.  Costa stated that this *quid pro quo* applied to all executive level positions that were part of the patronage system and included diverting funds and resources from works and contracts falling under the control of the executive.

134.    According to Costa, the director of services at Petrobras was responsible for the Company's largest contracts, totaling approximately 90% of applied resources.  That director was controlled by the Workers' Party, first through Pedro Barusco, and then through Renato Duque, who succeeded Barusco.  Costa explained that the Petrobras Presidency and seven of Petrobras's business segment directors were divided among the political parties forming the majority coalition.  For directors under the Workers' Party's control, all of the bribe money was delivered to party treasurer Vaccari.  Even for money coming through other directors not directly under the Workers' Party's control, a majority of the bribes went to Vaccari and the Workers' Party, with the director's sponsoring political party and certain "facilitators" (*i.e.*, money launderers) taking the rest of the bribe money.

### 4.      The Inflated Costs of Petrobras's Refineries and Other Projects

#### (a)      The Pasadena Refinery

135.      In 2006, Petrobras drastically overpaid for a refinery in Pasadena, Texas, paying $360 million for a 50% stake in the refinery even though the entire refinery had been sold just a year earlier for $42.5 million.  After a legal dispute with the owner of the other 50% share, plus interest payments, Petrobras paid a total of $1.18 billion to own the Pasadena Refinery.  Costa and other Petrobras managers accepted bribes to approve the wildly inflated purchase.

#### (b)      The Abreu Refinery

136.      Another example of the bribery and kick-back scheme involves the Abreu Refinery, whose costs skyrocketed from $4 billion to over $18 billion.  According to a January 18, 2015 report in *Folha de S. Paulo*, much of the cost increase was due to add-on-contracts awarded to the Cartel companies, which caused an estimated $3.1 billion in padded bids.

137.      In 2005, Petrobras had approved plans to build the Abreu Refinery as one of Brazil's first new refinery projects in over twenty years.  Costa, then director of the refining, transportation and marketing division, was primarily responsible for managing construction.

138.      Investors soon raised concerns over the increasing costs and delays at the Abreu Refinery.  Although the initial budget had projected that it would cost Petrobras $2.4 billion to construct the Abreu Refinery, the anticipated cost ballooned to $12 billion in just three years.

139.      In early 2009, the Brazilian Tribunal de Contas da União ("TCU") (the National Accounting Court) investigated and audited several Petrobras programs and discovered serious issues with the site preparation contract related to the Abreu Refinery, which was in the initial phase of construction.  Investigators detected widespread overcharging on contracts and irregular tendering practices.  In a report that was delivered directly to Petrobras's Board of Directors, the TCU reported on these practices, criticized Petrobras for obstructing its investigation by waiting

until the last day of the investigation to deliver documents to the TCU, and recommended halting construction on the Abreu Refinery until the Company addressed the irregularities.  Nonetheless, the Petrobras Board overruled this recommendation.  "The government doesn't want oversight," said Silvio Sinedino, a Petrobras director, adding that important financial information on projects was often provided the day of meetings and that government officials tried to strong-arm the board.

140.    The TCU continued to flag irregularities in reports on the Abreu Refinery for 2010, 2011, 2012, and 2013.  According to Saulo Puttini, one of the TCU auditing officials, the TCU's findings were "a clear warning sign of bigger problems and likely corruption."

141.    In light of these concerns raised by the TCU, Brazil's opposition parties sought to create a Parliamentary Investigative Committee ("PIC") to investigate cases of corruption involving Petrobras, including overbilling contractors associated with the Abreu Refinery.  Petrobras was determined to prevent the investigation at all costs.  Costa related the details of meetings he attended with representatives from controlling political parties regarding investigations into the possible corruption surrounding construction of the Abreu Refinery.  At the first meeting, the representatives told Costa that the investigation was not in the interest of the controlling political parties or the nation.  Costa recounted the details of the meeting to Gabrielli's Chief of Staff, who told Costa that Petrobras could not afford a scandal and that something must be done to stop the investigation.  At the second meeting, a politician in attendance told Costa that he would help stop the investigation, but that his political party would need R$10 million.  Costa requested the bribe money from the Cartel member working on the Abreu Refinery, who agreed to pay the bribe.

142.    Despite the bribe, the investigation was approved and installed in 2010—over the vehement opposition of the controlling political parties.  Nevertheless, the man selected to head the investigation, and who was responsible for directing its efforts, was one of the politicians from the controlling party that had participated in the meetings with Costa.  Unsurprisingly, given the bribe, the investigation found that there were no irregularities with the Abreu Refinery and concluded that the earlier TCU audits finding irregularities were flawed.

(c)    The Comperj Refinery

143.    The Comperj Refinery is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010, and is scheduled to commence production in 2020.  According to documents released by the TCU in October 2014, Petrobras will spend $21.6 billion to complete the Comperj Refinery, which is 60% more than originally budgeted.  The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."  The TCU also concluded that Petrobras's management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

144.    The audit found excessive risk-taking and a disregard of standard operating procedures, significantly impacting the timing and the cost of the project.  Contracts worth $3.1 billion were given without bidding.  The audit warned that the project is threatening Petrobras with heavy losses.  Additionally, the audit found a lack of clarity in disclosing the costs of the project.

### 5.   Petrobras's Senior Executives' Knowledge of the Scheme

145.   Countless Petrobras employees were involved in the scheme and the corruption reached to Petrobras's senior executives at the highest levels.  Youssef, the money launderer whose dealings were the initial target of Operation Car Wash, claims that Brazilian President Rousseff, who chaired the Petrobras Board of Directors from 2003 to 2010, knew about the kick-backs.  Youssef was quoted in *Forbes* magazine as saying that, "[t]he CEO of Petrobras and the President understood the scheme."  Prosecutors are currently investigating at least forty-nine politicians from six political parties in connection with the scheme, including the heads of both houses of Congress and a former energy minister.  As previously stated, Brazilian authorities have charged the speaker of Brazil's lower house of Congress with corruption.

146.   Petrobras's former manager of downstream operations, Venina Velosa da Fonseca, testified under police protection that she met with Foster in 2008 (before Foster became CEO) and told Foster about inflated contracts and payments for services that were not carried out.  At the time, Foster led the energy and gas division and reported to then-CEO Gabrielli.  Fonseca stated, "I met with the CEO personally when she was director of the gas and energy unit.  At that time, we discussed the matter.  I handed over to her the documents about the complaints.  Afterward, she had access to these anomalies at the management meetings."  Fonseca testified that she told Foster, "[s]ince 2008, I have been reporting these problems to my superiors, culminating now I'm taking all this documentation to the prosecutor."  Fonseca, who had reported internally for years regarding irregularities at Petrobras, was sent to Singapore and subsequently was terminated.

### 6.   Petrobras's Admission of Inflated Asset Values

147.   On November 13, 2014, after the markets closed, Petrobras issued a press release that acknowledged, for the first time, that the Company might need to write down asset values

(capitalized on its financial statements under PP&E) to eliminate fraudulently incurred bribery-related payments that should not have been capitalized.

148.    On November 17, 2014, Petrobras hosted a conference call for analysts and investors.  During that call, CEO Foster stated:

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is not able to publish its 3Q14 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef . . . revealed information that may lead to possible adjustments in the financial statements of our Company.
>
> Because of these depositions, therefore, we need more time to make any possible adjustments to the financial statements.  More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and we need more time as it is fundamentally important to improve our internal controls.

149.    During the question-and-answer portion of the call, the following exchange occurred between CFO Barbassa, CEO Foster, and an analyst:

> [**Analyst**]: [I]f we suppose[] . . . [BRL] 5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company?  What are the main line items that would be impacted?
>
> **CFO Barbassa:** The adjustment that could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, this value should be removed from PP&E line item [adjusted] value[.]
>
> *       *       *
>
> **CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what the judges are calling evidence, temporary evidence.  So, in this case, we have a schedule of activities, and we have deadlines to each one of these activities.

> For example, there is definition of criteria to measure the effects of losses caused by fraud.  In here, in the objective, in material fashion, our reference will be the depositions made so far, the evidence provided that will be submitted to Petrobras by the federal police.  We will then use this evidence to have our write-downs, and to the write-downs year after year regarding companies A, B, C or D that we might have contracted.

150.    In January 2015, CEO Foster and most of the Petrobras Board of Directors agreed to take a net write-down of R$61.4 billion (approximately U.S.$22 billion) for the third quarter, but President Rousseff, through a government-appointed board member, vetoed the proposal, saying it was too large.  A source in Brazil has told *Reuters* that "[e]ssentially the government didn't want the write-down to be interpreted as totally related to corruption."  Ultimately the full Board rejected the R$61.4 billion write-down.

151.    On April 22, 2015, Petrobras issued an interim condensed consolidated statement of financial position, which was filed with the SEC as part of a Form 6-K filing on April 23, 2015.  In this filing, Petrobras admitted that the corruption scandal caused the valuations of its assets to be improperly inflated and that write-downs reflecting the true value of the assets were necessary, stating:

> [S]enior Petrobras personnel conspired with contractors, suppliers and others from 2004 through April 2012 to establish and implement an illegal cartel that systematically overcharged the Company in connection with the acquisition of property, plant and equipment. . . . The overpayments were used to fund improper payments to political parties, elected officials or other public officials, individual contractor personnel, the former Petrobras personnel and other individuals involved in the payment scheme.
>
> . . .
>
> Petrobras believes that under IAS [International Accounting Standard] 16, the amounts it overpaid pursuant to this payment scheme should not have been included in the historical costs of its property, plant and equipment.

152.    The Company then wrote off just over $2.5 billion of capitalized costs representing the Company's estimate of the amounts that Petrobras overpaid for the acquisition of PP&E.

153.    The Company explained that it reached the write-off amount by: (1) identifying the contractual counterparties that were members of the Cartel; (2) identifying contracts with these counterparties between 2004 and April 2012; (3) identifying the total contract values of those contracts; and (4) applying a fixed 3% to the total values of the contracts.

154.    The Company's write-off grossly understates the size of the actual damage to the Company.  As discussed above, the scheme was not limited to the 3% in bribes, but also included contracts inflated to "stretch[]" profits "to the limit the contracting enterprise allow[ed]."

155.    Additionally, the bribery scheme did not end in April 2012, but continued through 2014.  Costa has testified that after he left the Company in April 2012, he set up a consulting company, "Costa Global," to facilitate the payment of bribes relating to the Abreu Refinery and other contracts.  Costa admitted that Costa Global entered into an arrangement with a contractor that performed significant work at the Abreu Refinery throughout the Relevant Period under which Costa received R$100,000 per month for thirty months (approximately U.S.$1 million total).  On August 20, 2015, the contractor signed a cooperation agreement with the Brazilian government and admitted to setting contract bids with other construction companies from early 2000 to 2013.

156.    The three independent members of Petrobras's Board of Directors criticized the Company's write-down as failing to accurately reflect the fraud's scope.  They protested that they were given less than two hours to review 319 pages of documents before voting on the calculation.  Two of the three voted against the release, while the other abstained from voting.

One of the members voting against the release, Mauro Rodrigues da Cunha (who represents minority shareholders), was critical of the time afforded for the review and disagreed with the methodology adopted to calculate the impairment charge, while calling the impairment amount inadequate to account for the fraud-related losses.  The other member voting against the release, Silvio Sinedino (who was elected by company workers), disagreed with the calculation of the asset write-downs, specifically noting that the overvaluation of the Abreu Refinery was not included in the write-down calculation.  The member that abstained, Jose Guimaraes Monforte (who represents nonvoting shareholders), said that the "effort . . . fell short of what full due diligence would require on my part, especially given the need for recovering the company's credibility."  All three independent directors have since left the Petrobras Board.

157.    The two minority members of Petrobras's Fiscal Council[1] voted against approving the Company's financial statements for the fiscal year ended December 31, 2014 due to improprieties in Petrobras's asset impairment test.  The two minority members, Reginaldo Ferreira Alexandre and Walter Luis Bernardes Albertoni, stated that the "records proposed for the assets related to the Operation Lava Jato, as a result of the impairment tests, are disconnected from the effective realizable value" in that they "were informed that refinery assets suffering losses are limited to the RNEST (Trem 2) [Abreu] and Comperj [Refineries]," that "values recorded now show significant differences when compared to those found by independent evaluators, evidencing the discrepancy between this independent evaluation and the values proposed by the management," that "the evaluation methodology adopted by the Company . . .

---

[1]   The Petrobras Fiscal Council was established pursuant to the Brazilian Corporate Law and is composed of five members.  The Fiscal Council is independent of Petrobras's management and external auditors.  Its responsibilities include, among others: (i) monitoring management's activities and (ii) reviewing Petrobras's annual report and financial statements. *See* Petrobras 2014 Form 20-F at 123, http://www.investidorpetrobras.com.br/download/2958.

makes it unfeasible to run a critical analysis of each of the refinery units," and that "different

technical discussions held with the management at recent meetings [were] inconclusive."

158.    Institutional Shareholder Services, Inc. ("ISS"), the global leader in corporate

governance, recommended that shareholders vote against the financial statements for the fiscal

year ended December 31, 2014.  According to ISS, a negative vote was warranted because:

a.    There [were] significant concerns regarding the accounts presented by the
Company and questions were raised regarding the methodology used to calculate
the losses due to corruption practices and impairments;

b.    The 2014 financial statements and statutory reports were approved only by the
seven members of Petrobras's Board of Directors appointed by the controlling
shareholder (the Brazilian government), four of whom [were] being investigated
by the Brazilian securities regulator (CVM) for potential breaches of their
fiduciary duties;

c.    Minority board representatives and the Petrobras employees' representative to the
Board of Directors either opposed or abstained from approving the financial
statements;

d.    The two minority members of Petrobras's Fiscal Counsel also voted against
releasing the Company's financial statements in light of concerns regarding the
methodologies used by the Company and the lack of a more conservative
approach; and

e.    The approval of the Company's statutory reports could likely discharge directors,
some of whom were already under investigation by the Brazilian securities
regulator, from civil liability for decisions made over the relevant fiscal year.

**D.    Petrobras's False and Misleading Financial Statements**

159.    Petrobras's improper capitalization of bribery-related payments violated

Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting

Standards ("IFRS") and led to its financial statements being materially false and misleading

during the Relevant Period in at least three ways.  *First*, by improperly capitalizing the bribery-

related payments and then failing to conduct appropriate write-downs, Petrobras overstated the

value of its PP&E and the total value of its assets.  *Second*, because bribery-related payments

should have been treated as operating expenses and deducted from net revenues, rather than capitalized and depreciated over time, Petrobras's operating expenses were understated and its net income was overstated. *And third*, because Petrobras calculated depreciation, depletion and amortization ("DD&A") expenses by reference to inflated asset values (as a result of both bribes and collusively overpriced contracts), Petrobras's DD&A expenses were inflated.

### 1. 2009-2010 – United States GAAP Violations

160. Petrobras's Form 20-F annual reports for 2009 and 2010 stated that "[t]he audited consolidated financial statements of Petrobras and our consolidated subsidiaries . . . have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

161. Accounting Standards Codification ("ASC") 360 of GAAP requires that the carrying values of PP&E be initially measured at historical cost, including all normal expenditures necessary to bring the asset to a location and condition for its intended use. GAAP does ***not***, however, permit general administrative or overhead expenses to be included when capitalizing assets because such costs do not give rise to any expectations of future profitability. As discussed in paragraphs 147-158 above, Petrobras improperly capitalized bribery-related payments and paid collusively-set contract prices that inflated the costs of the properties it acquired without in any way enhancing their values. By doing so, Petrobras violated GAAP.

162. GAAP also requires that a Company write-down the values of its PP&E when events indicate that the carrying value of an asset or group of assets may not be recoverable. ASC 360-10-35-17 provides, "An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. . . . An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value."

163.   Petrobras specifically represented that it was, in fact, carrying out reviews of its long-lived assets in order to determine whether write-downs were necessary and appropriate as required by GAAP.  The Company's Forms 20-F for 2009 and 2010 each stated that:

> In accordance with Codification Topic 360-10, management reviews long-lived assets, primarily property, plant and equipment to be used in the business and capitalized costs relating to oil and gas producing activities, whenever events or changes in circumstances indicate that the carrying value of an asset or group of assets may not be recoverable on the bases of undiscounted future cash flows. The reviews are carried out at the lowest level of assets to which the Company is able to attribute to identifiable future cash flows.  The net book value of the underlying assets is adjusted to their fair value using a discounted future cash flow model, if the sum of the expected undiscounted future cash flows is less than book value.
>
> The main assumptions of the cash flows are: prices based on last strategic plan presented, production curves associated to existent projects comprising the Company's portfolio, operating market costs and investments needed for projects conclusion.

164.   Petrobras knew that the carrying values of PP&E that had been impacted by bribery were not recoverable because those values had been inflated by fraud.  Petrobras, however, failed to conduct appropriate write-downs to reflect this fact.  As discussed in paragraphs 147-158, the Company has admitted that such write-downs were necessary in amounts in excess of $2.5 billion.

165.   Petrobras's practice of capitalizing bribery-related payments also caused its operating expenses to be understated and its net income to be overstated.  GAAP provides that general and administrative expenses should be recorded as expenses, not capitalized, and Petrobras's Form 20-F for 2009 and 2010 each stated that its operating expenses include "general and not administrative expenses."  Thus, by capitalizing bribery-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses.  Because operating expenses are subtracted from net operating revenues in calculating net income (but

capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

166.     Petrobras's inflated valuations of its PP&E caused its DD&A to be overstated. Petrobras's Forms 20-F for 2009 and 2010 each stated that PP&E was depreciated on a straight line basis.  Thus, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that the property's capitalized cost was inflated by bribery.  For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

### 2.     2011-2014 – IFRS Violations

167.     Beginning with fiscal year 2011, Petrobras switched from the use of GAAP to use of IFRS for its financial statements.  Each of Petrobras's Form 20-F annual reports for 2011, 2012, 2013, and 2014 contained a statement to the effect that the Company's "consolidated financial statements have been prepared and are being represented in accordance with the International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board."

168.     Under IFRS, International Accounting Standard ("IAS") 16 governs the initial capitalization of PP&E.  Certain relevant provisions of IAS 16 are listed below.

a.     IAS 16-7 provides that "[t]he cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (a) it is probable that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably."

b.     IAS 16-15 provides that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost."

c.     IAS 16-16 provides that "[t]he cost of an item of property, plant and equipment comprises: (a) its purchase price, including import duties and non-refundable purchase taxes, after deducting trade discounts and rebates[; and] (b) any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management[.]"

d.   IAS 16-19 provides that "[e]xamples of costs that are not costs of an item of property, plant and equipment are . . . (d) administration and other general overhead costs."

169.   Petrobras stated in its Form 20-F filings that it was following these rules.  Its 2011, 2012, and 2013 Forms 20-F each included language to the effect that, "[p]roperty, plant and equipment, net is stated as the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."

170.   Because paying bribes and kick-backs to contractors did not give rise to any future economic benefits that would flow to Petrobras, and because the costs of corruption by their nature cannot be measured reliably, the costs that Petrobras incurred by paying bribes did not qualify for recognition as assets under IAS 16-7.  Rather, they would fall under the category of general overhead costs, which IAS 16-19(d) specifies may not be capitalized.

171.   Furthermore, like GAAP, IFRS requires that capitalized items of PP&E be written down where there is evidence that the carrying value of those assets exceeds fair value (*i.e.*, market value as determined by an appraisal).  Relevant portions of IAS 16 include:

a.   IAS 16-30: "After recognition as an asset, an item of property, plant and equipment shall be carried at its cost less any accumulated depreciation and any accumulated impairment losses."

b.   IAS 16-31: "After recognition as an asset, an item of property, plant and equipment whose fair value can be measured reliably shall be carried at a revalued amount, being its fair value at the date of the revaluation less any subsequent accumulated depreciation and subsequent accumulated impairment losses.  Revaluations shall be made with sufficient regularity to ensure that the carrying amount does not differ materially from that which would be determined using fair value at the end of the reporting period."

c.   IAS 16-32: "The fair value of land and buildings is usually determined from market-based evidence by appraisal that is normally undertaken by professionally qualified values.  The fair value of items of plant and equipment is usually their market value determined by appraisal."

d.      IAS 16-34: "The frequency of revaluations depends upon the changes in fair values of the items of property, plant and equipment being revalued. When the fair value of a revalued asset differs materially from its carrying amount, a further revaluation is required . . . ."

172.      Regarding revaluation, Petrobras's 2011, 2012 and 2013 Forms 20-F each included language substantially identical to the below:

> Property, plant and equipment and intangible assets with definite useful lives are assessed for impairment when there is an indication that the carrying amount may not be recoverable. Assets related to exploration and development of oil and gas and assets that have indefinite useful lives, such as goodwill acquired in business comparisons are tested for impairment annually, irrespective of whether there is any indication of impairment.
>
> The impairment test comprises a comparison of the carrying amount of an individual asset or a cash-generating unit with its recoverable amount. Whenever the recoverable amount of the unit is less than the carrying amount of the unit, an impairment loss is recognized to reduce the carrying amount to the recoverable amount. The recoverable amount of an asset or a cash-generating unit is the higher of its fair value less costs of disposal and its value in use. Considering the specificity of the Company's assets, value in use is generally used by the Company for impairment testing purposes, except when specifically indicated.

173.      Petrobras violated IAS 16 by failing to write down to their market value those assets whose costs had been inflated by fraud. Petrobras knew that the fair value of its assets differed materially from their carrying values and that, to the extent its asset values had been inflated by bribery-related payments, such inflation was not recoverable. Nevertheless, the Company failed to take appropriate write-downs as required by IAS 16-30 and 16-31 until April 2015.

174.      Petrobras's practice of capitalizing bribery-related payments also understated its operating expenses and overstated its net income. As discussed above, IAS 16-7 prohibits the recognition as capital assets of general and administrative expenses not likely to cause future economic benefits. Rather, under IAS 7, these expenses must be recorded as operating expenses

and included in the reporting entity's cash flow statement.  Petrobras's Forms 20-F for 2011, 2012, and 2013 each stated that its operating expenses include "general and administrative expenses."  Thus, by capitalizing bribery-related payments, rather than recording them as operating expenses, Petrobras understated its operating expenses.  Because operating expenses are subtracted from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

175.    As under GAAP, Petrobras's inflated PP&E also caused its DD&A to be overstated.  Petrobras's Forms 20-F for 2011, 2012, and 2013 each contained a statement to the effect that, "[e]xcept for land, which is not depreciated, other property, plant and equipment are depreciated on a straight line basis."  Thus, again, the DD&A for each property that was affected by the bribery scheme was overstated to the degree that the property's capitalized cost was inflated by bribery.  For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

## VI.    EXCHANGE ACT

### A.    Overview of Claims

176.    Plaintiffs' claims arise from a litany of false statements of material fact and omissions of material adverse information made by Defendants throughout the Relevant Period concerning both quantitative and qualitative matters, including: (1) the value of Petrobras's assets; (2) the Company's periodic expenses and net income; (3) the Company's anti-bribery and anti-corruption policies; and (4) the adequacy of the Company's disclosure controls and procedures, including its internal controls over financial reporting.  These misstatements spanned many years, permeated the market, and obfuscated reality.  The false and misleading statements chronicled below are merely examples of Petrobras's repeated false statements and material

omissions.  When the Company issued a series of corrective disclosures that revealed the truth about these matters, the market value of the Petrobras Securities fell materially and caused Plaintiffs loss.

### B.    False and Misleading Statements

177.    In response to investigations into the overpricing of Petrobras's contracts, Petrobras enacted a multi-faceted plan to deny any allegations of wrongdoing and to assure the market that there was no political interference in Petrobras's operations.  Among other initiatives, Petrobras created an official website entitled "Fados e Datos" ("Facts and Data") that was linked to Petrobras's corporate webpage.  Petrobras heralded the Facts and Data website as a "landmark" in establishing new means of communication with the Company's stakeholders and said the website was created to give transparency to Petrobras's processes.

178.    In a January 28, 2010 post to the Facts and Data website, Petrobras "reiterate[d] that there have been no irregularities in contracts referring to the works of the Abreu e Lima Refinery [and] in the construction of . . . Comperj."

179.    On January 29, 2010 Petrobras posted on the Facts and Data website that it "reaffirms that there has been no 'overbilling' or 'overpricing' in the Abreu [] refinery."

180.    The January 28 and 29, 2010 posts to the Facts and Data website were false and misleading due to their omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including with respect to the Abreu Refinery and the Comperj Refinery.

181.    On March 24, 2010, the Company issued a press release announcing its financial results for 2009.  The Company reported that as of December 31, 2009, it had net PP&E of $136 billion, total assets of $200 billion, total costs and expenses of $70 billion (including DD&A of $7.1 billion), and net income of $15.5 billion.

182.     The same day, Petrobras hosted an analyst conference call.  As part of his

prepared remarks, then-CEO Gabrielli stated, in part, (translated from Portuguese):

> In downstream, we invested in 2009 BRL17.3 billion.  Most of the investment,
> 34% was in fuel quality, which is that we are increasing our capacity for reducing
> sulfur emission in our gasoline and diesel, trying to meet the environmental
> requirements of Brazil.
>
> *   *   *
>
> Also, we had a very important cost reduction efforts.  We operate in several areas.
> We changed our bidding process.  We divide the packages and different suppliers
> in such a way that we could get more competitive bids.  We standardized more of
> our projects.

Later, CEO Gabrielli discussed the Abreu Refinery with an analyst:

> [**Analyst**]: [O]n the refining CapEx, I'd like to understand why for instance the
> Abreu and Lima refinery is estimated to have a cost that is twice as much the cost
> of a refinery of similar complexity in the US or Europe?  I might be missing
> something, so I just wanted to understand if maybe it is related to infrastructure or
> something else, and maybe even the Maranhão and Ceará refineries seem to be a
> bit higher in terms of cost versus the international benchmark.  So these are my
> two questions.  Thank you.

> **CEO Gabrielli**: First, we have very little flexibility for 2010 because most of the
> investment for 2010 is already ongoing investments that we have the contracts.
> We have to deal with this reality which means that we need the capitalization in
> 2010.  That is a very important thing to highlight.  We need the capitalization in
> 2010.  If we are going to have a capitalization with the transfer of rights,
> production rights, or not is another thing, but we need the capitalization for 2010,
> That is a very important thing.

> We are working right now with the hypothesis that we are going to have the
> capitalization with the transfer of rights for production from the Government.  But
> we have to consider also the possibility of not to have the transfer, that is the first
> thing.

> The second thing is on the refinery costs, we are finishing the numbers.  If you
> have the numbers, please tell me because we have not finished it, we do not have
> them.

> [**Analyst**]: We got the numbers from what the global press said and from what
> local reports from what the TCU indicates.

> **CEO Gabrielli**: Ok, if you have them, which is another thing.  But we are
> finishing the numbers and for sure that is something that we have to take into

consideration on a qualitative basis.  For example, most of the assessment of the cost of refineries is a kind of plug-and-play refinery in which you go, produce the refinery, and plug to the infrastructure and this is it.  This is not our case.

183.    The March 24, 2010 press release and analyst conference call statements were false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.  In addition, CEO Gabrielli's statements regarding (1) the Company's PP&E investments; (2) the Company's bidding processes; and (3) the high cost of the Abreu Refinery were materially false and misleading due to his omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs.

184.    On May 20, 2010, Petrobras filed the 2009 Form 20-F with the SEC, which set forth substantially similar figures as in the March 24, 2010 press release.  The 2009 Form 20-F also included the following certification signed by Gabrielli that Petrobras's internal controls over financial reporting were effective:

I, José Sergio Gabrielli de Azevedo, certify that:

1.  I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting, (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

185.   These statements were materially false and misleading because (1) Petrobras's

claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's

stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

186.    On May 27, 2010, Petrobras issued a press release announcing its financial results for the first quarter of 2010.  The Company reported that as of March 31, 2010, it had net PP&E of $141 billion, total assets of $204 billion, total costs and expenses of $21.3 billion, including DD&A of $2.0 billion, and net income of $4.3 billion.

187.    These statements were materially, false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

188.    On August 24, 2010, Petrobras issued a press release announcing its results of operations for the second quarter of 2010.  The Company reported that as of June 30, 2010, it had net PP&E of $147 billion, total assets of $211 billion, total costs and expenses of $23.4 billion, including DD&A of $2.1 billion, and net income of $4.2 billion.

189.    In a letter to shareholders and investors released together with the August 24, 2010 press release, Gabrielli stated:

> We are passing through an exceptional time in our history.  In the first six months of 2010, we invested a record amount of US $19,387 million, 35.8% more than the same period last year, primarily allocated to increasing oil and gas production capacity, modernizing and expanding our refineries and reorganizing our interests in the petrochemical sector, particularly in regard to Braskem.
>
> This substantial increase in capital expenditures is a reflection of the number and quality of projects in our investment portfolio as reflected in the expansion of our strategic business plan.  In June, we released the 2010-2014 Business Plan, in

which we project investment spending of U.S. $224 billion, or approximately U.S. $45 billion per year.

190.     On August 25, 2010, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for the six-month period ended June 30, 2010 which set forth

substantially similar figures as in the August 24, 2010 press release.

191.     These statements were materially false and misleading because (1) Petrobras's

claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's

stated DD&A expenses were overstated as a result of the bribery-related asset overstatements;

and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related

asset overstatements.  In addition, Gabrielli's statements in the shareholder letter were false and

misleading due to his failure to mention bribery-related expenses as one of the factors

responsible for the growth of the Company's capital expenditures.

192.     In an October 8, 2010 post to the Facts and Data website in response to an article

reporting that the TCU found overbilling at the Comperj Refinery, Petrobras insisted that "there

are no irregularities in the contracts of . . . Comperj," "there is no overbilling" at the Comperj

Refinery, and that Petrobras had strictly observed competitive bidding mandates governing the

Company's business.

193.     These statements were materially false and misleading due to their omission of

any mention of the bribery scheme and its effect of inflating Petrobras's costs, including with

respect to the Comperj Refinery.

194.     In a November 9, 2010 post to the Facts and Data website in response to TCU

allegations that contracts on refineries, including the Abreu Refinery, were overpriced by billions

of dollars, Petrobras "denie[d] that there have been irregularities in the works of the . . . Abreu e Lima (Rnset) refiner[y]."

195.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including with respect to the Abreu Refinery.

196.    On November 23, 2010, Petrobras issued a press release announcing its results of operations for the third quarter of 2010.  The Company reported that as of September 30, 2010, it had net PP&E of $206 billion, total assets of $298 billion, total costs and expenses of $25.1 billion, including DD&A of $2.1 billion, and net income of $4.7 billion.

197.    On November 24, 2010, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the nine-month period ending September 30, 2010 with figures substantially similar to those set forth in the Company's November 23, 2010 press release.

198.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result the bribery-related asset overstatements.

199.    On March 15, 2011, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2010.  The Company reported that as of December 31, 2010, it had net PP&E of $219 billion, total assets of $309 billion, total cost and expenses of $96 billion, including DD&A of $8.5 billion, and net income of $19.2 billion.

200.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

201.    On May 24, 2011, Petrobras issued a press release announcing its results of operations for the first quarter of 2011.  The Company reported that as of March 31, 2011, it had net PP&E of $230 billion, total assets of $331 billion, total costs and expenses of $25.2 billion, including DD&A of $2.3 billion, and net income of $6.5 billion.

202.    On May 26, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2011, which set forth substantially similar figures as in the May 24, 2011 press release.

203.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

204.    On May 26, 2011, Petrobras and PifCo filed the 2010 Form 20-F, which set forth substantially similar figures as in the March 15, 2011 press release.  The 2010 Form 20-F also included certifications substantially similar to those described in paragraph 184, signed by then

Petrobras CEO Gabrielli and CFO Barbassa, and by PifCo CEO Oliveira and CFO Tinoco, certifying that Petrobras's internal controls over financial reporting were effective.

205.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

206.    On or about June 6, 2011, Petrobras published its 2010 Sustainability Report on its website.  This document stated that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that "it is not involved in corruption."

207.    These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and was involved in a multi-billion dollar bribery scheme.

208.    On August 15, 2011, Petrobras issued a press release announcing its results of operations for the second quarter of 2011.  The Company reported that as of June 30, 2011, it had net PP&E of $247 billion, total assets of $351 billion, total costs and expenses of $31.2 billion, including DD&A of $2.5 billion, and net income of $6.6 billion.

209.    On August 16, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2011 which set forth substantially similar figures as in the August 15, 2011 press release.

210.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

211.    In an August 15, 2011 post to the Facts and Data website, Petrobras stated that "in regard to material 'suspect donations' published in the edition No. 2179 by Istoe, Petrobras vehemently repudiates the insinuation of political favoritism toward the enterprise Jarague Equipamentos Industriais Ltda. or any other enterprise supplying the Company." The post also reiterated that Petrobras followed strict bidding procedures.

212.    These statements were materially false and misleading due to (1) their omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs; and (2) their failure to disclose that Petrobras was contributing money to Workers' Party officials and other politicians and political parties as part of its ongoing, multi-billion dollar bribery scheme.

213.    In a November 8, 2011 post to the Facts and Data website, Petrobras stressed "that there has not been overbilling, overpricing, or any other irregularity in its works."

214.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs.

215.    On November 22, 2011, Petrobras issued a press release announcing its results of operations for the third quarter of 2011. The Company reported that as of September 30, 2011, it had net PP&E of $220 billion, total assets of $309 billion, total costs and expenses of $31.5 billion, including DD&A of $2.6 billion, and net income of $3.9 billion.

216.    Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2011, which set forth substantially similar figures as in the November 22, 2011 press release.

217.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

218.    On February 28, 2012, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2011.  The Company reported that as of December 31, 2011, it had net property, plant and equipment of $182 billion, total assets of $319 billion, total costs and expenses of $19 billion, including DD&A of $10.5 billion, and net income of $20 billion.

219.    On February 29, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for 2011, which set forth substantially similar figures as in the February 28, 2012 press release.

220.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

221.    On April 2, 2012, Petrobras filed the 2011 Form 20-F, which set forth substantially similar figures as in the February 28, 2012 press release.  The 2011 Form 20-F also included certifications substantially similar to those described in paragraph 184 above, signed by Petrobras CEO Foster and CFO Barbassa, and by PifCo CEO Oliveira and CFO Tinoco, certifying that Petrobras's internal controls over financial reporting were effective.

222.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

223.    On May 15, 2012, Petrobras issued a press release announcing its results of operations for the first quarter of 2012.  The Company reported that as of April 30, 2012, it had net PP&E of $194 billion, total assets of $338 billion, total costs and expenses of $4.7 billion, including DD&A of $2.7 billion, and net income of $5.3 billion.

224.    On May 17, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2012, which set forth substantially similar figures as in the May 15, 2012 press release.

225.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements;

and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

226.   On or about June 21, 2012, Petrobras published its 2011 Sustainability Report on its website.  This document included the following statements about the anti-corruption policies of the "Petrobras System," *i.e.,* Petrobras and its subsidiaries, affiliates, and associated companies (among others):

> The Petrobras System refuses any practice that involves corruption or bribery, and uses management instruments such as the Competition Behavior and Good Practice codes, in addition to following the Code of Conduct of the High Federal Administration, the application of which is inspected by the Presidency of the Republic's Ethics Commission.

> \*   \*   \*

> According to its Code of Ethics guidelines, the Petrobras System makes no contributions to political parties or to candidates for elective offices.  The company's business requires transparency in actions and positions, particularly regarding the information published to society.

> \*   \*   \*

> To ensure transparency in its relations with the Government, Petrobras System's Code of Ethics determines the company will not make contributions to political parties or to campaigns of candidates to elected office.  It also emphasizes that it refuses any act of corruption and bribery and that it has formal control and consequence procedures in place to handle any breaches occurring within the company.

> \*   \*   \*

> The company . . . is not involved in . . . corruption.

227.   These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and was involved in a multi-billion dollar bribery scheme.

228.   On August 3, 2012, Petrobras issued a press release announcing its results of operations for the second quarter of 2012.  The Company reported that as of June 30, 2012 it had

net PP&E of $185 billion, total assets of $311 billion, total costs and expenses of $10.2 billion, including DD&A of $5.3 billion, and net income of $4.5 billion.

229.    On August 10, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2012, which set forth substantially similar figures as in the August 3, 2012 press release.

230.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

231.    On October 26, 2012 Petrobras issued a press release announcing its results of operations for the third quarter of 2012.  The Company reported that as of September 30, 2012, it had net PP&E of $191 billion, total assets of $318 billion, total costs and expenses of $5.7 billion, including DD&A of $2.6 billion, and net income of $2.8 billion.

232.    On October 30, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2012, which set forth substantially similar figures as in the October 26, 2012 press release.

233.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements;

and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

234.    In a December 29, 2012 post to the Facts and Data website, Petrobras represented that "all the activities of Petrobras and its employees are fully oriented by principles of ethics and transparency.  The Petrobras system denies any practice of corruption and utilizes rigorous management instruments to guarantee the protection of its shareholders' interests."

235.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs.

236.    In a January 7, 2013 post to the Facts and Data website in response to questions from *Jornal Nacional* about potential cost overruns at the Comperj Refinery, Petrobras "reiterate[d] that there are no irregularities in the construction of the Abreu e Lima Refinery . . . [and] also reaffirm[ed] that there are no irregularities in the [Comperj Refinery] works."

237.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including in connection with the Abreu Refinery and the Comperj Refinery.

238.    On February 4, 2013, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2012.  The Company reported that as of December 31, 2012, it had net PP&E of $205 billion, total assets of $332 billion, total costs and expenses of $19.6 billion including DD&A of $11.1 billion, and net income of $10.9 billion.

239.    On February 6, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the fourth quarter and full year of 2012, which set forth substantially similar figures as in the February 4, 2013 press release.

240.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

241.    On April 26, 2013, Petrobras issued a press release announcing its results of operations for the first quarter of 2013.  The Company reported that as of March 31, 2013, it had net PP&E of $214 billion, total assets of $345 billion, total costs and expenses of $9 billion including DD&A of $3.2 billion, and net income of $3.9 billion.

242.    On April 30, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2013, which set forth substantially similar figures as in the April 26, 2013 press release.

243.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery related asset overstatements.

244.    On April 29, 2013, Petrobras filed the 2012 Form 20-F, which set forth substantially similar figures as in the February 4, 2013 press release.  The 2012 Form 20-F also included certifications substantially similar to those described in paragraph 184 above, signed by

CEO Foster and CFO Barbassa, certifying that Petrobras's internal controls over financial reporting were effective.

245.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

246.     In May 2013, Petrobras published its 2012 Sustainability Report on its website. This document included the following statements regarding the Company's anti-corruption policies:

> To ensure transparency in our relations with the Government, our Code of Ethics states that we do not contribute to political parties or political campaigns of candidates to elective office.  We emphasize our refusal to countenance corrupt practices or bribery, and we maintain formal control procedures with consequences in the event of any transgressions in the company.

> \* \* \*

> No cases of corruption were detected in 2012.  We reject all corrupt practices and payment of bribes, and we use the Competitive Conduct and Good Practice Codes, and follow the Federal Administration Code of Conduct which has its application overseen by the Public Ethics Commission of the Presidency.

> \* \* \*

> The company . . . is not involved in . . . corruption.

247.     These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and was involved in a multi-billion dollar bribery scheme.

248.     In an August 7, 2013 post to the Facts and Data website, Petrobras quoted statements Gabrielli had made at a hearing of the Environmental Commission, Consumer

Protection and Inspection and Control, requested by Senator Ivo Cassol, during which Gabrielli denied any wrongdoing by Petrobras with respect to inflated contracts and insisted that "the acquisition [of the Pasadena Refinery] was a normal operation, based on market conditions."

249.   This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including in connection with the Pasadena Refinery.

250.   On August 9, 2013, Petrobras issued a press release announcing its results of operations for the second quarter of 2013.  The Company reported that as of June 30, 2013, it had net PP&E of $204 billion, total assets of $338 billion, total costs and expenses of $16.6 billion, including DD&A of $3.4 billion, and net income of $2.7 billion.

251.   On August 13, 2013 Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2013, which set forth substantially similar figures as in the August 9, 2013 press release.

252.   These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

253.   On October 25, 2013, Petrobras issued a press release announcing its results of operations for the third quarter of 2013.  The Company reported that as of September 30, 2013, it had net PP&E of $208 billion, total assets of $340 billion, total costs and expenses of $27.6 billion, including DD&A of $3.3 billion, and net income of $1.5 billion.

254.    On October 28, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2013, which set forth substantially similar figures as in the October 25, 2013 press release.

255.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

256.    In a November 13, 2013 post to the Facts and Data website intended to respond to press allegations regarding one of Petrobras's contracts, the Company published a "Clarification" of its bidding process and represented that "the process of biding, contracting and executing Petrobras services are constantly being evaluated by its Internal Auditor and its recommendations are diligently analyzed with a view to protecting the Company's interests."

257.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs and eliminating any legitimate competitive bidding process.

258.    On February 25, 2014, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2013.  The Company reported that as of December 31, 2013, it had net PP&E of $228 billion, total assets of $321 billion, total costs and expenses of $16.9 billion, including DD&A of $13.2 billion, and net income of $10.8 billion.

259.    The press release also quoted CEO Foster as stating:

Additionally, I would like to notice that in the second half of 2013 we implemented the Corruption Prevention Program, reaffirming the commitment of

the Petrobras Executive Board and of its employees with ethics and transparency at our organization.  The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

260.    On February 26, 2014, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for 2013, which set forth substantially similar figures as in the

February 25, 2014 press release.

261.    On March 7, 2014, Petrobras issued a press release regarding its internal controls

over financial reporting, stating:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

262.    On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC setting forth

substantially the same content as in the March 7, 2014 press release.

263.    These statements were materially false and misleading because (1) Petrobras's

claimed asset valuations were materially overstated due to the improper inclusion of bribery-

related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's

stated DD&A expenses were overstated as a result of the bribery-related asset overstatements;

(3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset

overstatements; (4) the Company was operating a multibillion dollar bribery scheme

notwithstanding its Corruption Prevention Program; and (5) the Company's internal controls

were not effective.

264.    On April 30, 2014, Petrobras filed the 2013 Form 20-F, which set forth

substantially similar figures as in the February 25, 2014 press release.  The 2013 Form 20-F also

included certifications substantially similar to those described in paragraph 184 above, signed by CEO Foster and CFO Barbassa, certifying that Petrobras' internal controls over financial reporting were effective.

265.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras's internal controls over financial reporting were not effective.

266.    In or around May 2014, Petrobras published its 2013 Sustainability Report on its website.  This document included the following statements regarding the Company's anti-corruption policies:

> In the second half of 2013, we introduced our Corruption Prevention Program, which reaffirms Petrobras management and workforce commitment to ethics and transparency in our organization.  The program meshes with local and international initiatives to combat fraud and corruption, and the legislation in countries in which we operate, thus favorably impacting relations with all stakeholders.
>
> In July, Petrobras introduced its Corruption Prevention Program in order to prevent, detect and correct fraud and corruption.  The program and its implementation are based on three aspects: prevention through education and clear policies on the importance of ethics in all our actions; mechanisms capable of detecting fraud or corruption; and a system of consequences to correct past problems.
>
> The program's benefits include reduced exposure to legal, image and reputational risk, strengthened corporate governance, centralized efforts for the shared aim of combating fraud and corruption, and improved relationships with stakeholders, such as partners and sources of funding.
>
> For our Internal Audit structure, the Executive Board approved a new General Controller Officer to strengthen implementation of control and compliance including mitigation of fraud and corruption risk, in order to meet legal and regulatory requirements.  This decision was ratified by the Board of Directors in

November.   The responsibilities of this General Office include the Corruption Prevention Program.

All our suppliers and business partners are covered by our guidance on anti-corruption policies and procedures through our Code of Ethics stipulated in contractual instruments and posted on our website.   The Code requires the process of selecting and signing suppliers to be based strictly on legal and technical criteria for quality, cost and punctuality.   Suppliers must have ethical profiles in terms of their management practices and social and environmental responsibility. They must reject unfair competition practices or others contrary to the code's precepts, including our suppliers' supply chains.

Our standard contracts and services agreements now include an anti-corruption paragraph with procedures to be adopted in cases of illicit actions under Brazilian law, the 1977 Foreign Corrupt Practices Law (USA), or the Bribery Act 2010 (United Kingdom).

*   *   *

Our Code of Ethics includes a commitment to refuse to support or contribute to political parties or campaigns of candidates running for elected office.

267.   These statements were false and misleading because (1) Petrobras was contributing money to Workers' Party officials; (2) Petrobras was involved in a multi-billion dollar bribery scheme; (3) Petrobras's process for selecting and signing suppliers was not based strictly on criteria regarding quality, cost, and punctuality; and (4) Petrobras failed to disclose the effect that the bribery scheme had upon its accounting.

268.   On May 9, 2014, Petrobras issued a press release announcing its results of operations for the first quarter of 2014.   The Company reported that as of March 31, 2014, it had net PP&E of $241 billion, total assets of $354 billion, total expenses of $8.2 billion, including DD&A of $3.0 billion, and net income of $2.4 billion.

269.   The press release also quoted CEO Foster as stating:

I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program.   All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.

90

270.     On May 12, 2014, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2014, which set forth substantially similar figures as in May 9, 2014 press release.

271.     These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements; and (4) the Company was operating a multibillion dollar bribery scheme notwithstanding its Corruption Prevention Program.

272.     In a May 23, 2014 post to the Facts and Data website, Petrobras represented that "it has strict legal procedures for payments, including for the purchase of [the] Pasadena [Refinery]. . . .  The payments made for any reason and in any country follow strict and clear procedures and relevant legislation.   Additionally, the Company has a structured Internal Audit group, which has unrestricted access to any unit of the Petrobras System to verify the compliance of procedures and transactions made."

273.     This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including in connection with the Pasadena Refinery.

274.     In a July 12, 2014 post to the Facts and Data website, Petrobras sought to reassure investors that it "has not found any facts or documents evidencing the payment of bribes to employees at Petrobras."

275.    This statement was materially false and misleading because Petrobras was contributing money to Workers' Party officials and other politicians and other political parties, and was involved in an ongoing, multi-billion dollar bribery scheme.

276.    In a July 14, 2014 post to the Facts and Data website, Petrobras affirmed again that there was no indication of irregularities and there was no overpricing or overbilling in connection with the Abreu Refinery.

277.    This statement was materially false and misleading due to its omission of any mention of the bribery scheme and its effect of inflating Petrobras's costs, including in connection with the Abreu Refinery.

278.    On August 8, 2014, Petrobras issued a press release announcing its results of operations for the second quarter of 2014.  The Company reported that as of June 30, 2014, it had net PP&E of $254 billion, total assets of $363 billion, total costs and expenses of $22 billion including DD&A of $3.5 billion, and net income of $2.3 billion.

279.    On August 11, 2014, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2014, which set forth substantially similar figures as in the August 8, 2014 press release.

280.    These statements were materially false and misleading because (1) Petrobras's claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras's stated DD&A expenses were overstated as a result of the bribery-related asset overstatements; and (3) Petrobras's stated net income was false and misleading as a result of the bribery-related asset overstatements.

C.        **Petrobras's Corrective Disclosures and Their Impact on the Market**

281.      After months of repeatedly and vehemently denying the existence of the bribery and corruption scheme, on October 27, 2014, Petrobras issued a formal statement filed in a Form 6-K with the SEC regarding Operation Car Wash.  In this statement, Petrobras acknowledged for the first time that the facts revealed by the police investigation could have a significant negative impact on its business.  The Company also outlined the steps the Company was taking in response to the testimony and the investigation.  Petrobras announced that it had hired two "independent specialized investigation companies," later identified as two law firms, to "examin[e] the nature, exten[t] and impacts of the actions that might have been performed" at the Company and to "analyze correlated facts and circumstances that might have [a] material impact over the Company's business."  On this news, the Company's common ADS declined $1.77 per ADS or nearly 14%, to close at $11.16 per ADS; the preferred ADS declined $1.97 or 14.64%, to close at $11.49; and the other Petrobras Securities declined materially.

282.      On November 1, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that Petrobras's auditor, PwC, had declined to sign off on the Company's third quarter financial results in light of the money-laundering and bribery investigations.  Specifically, PwC refused to sign off on the financial results for one of Petrobras's subsidiaries, Transpetro, as they were signed by Sergio Machado, the Petrobras executive implicated by Costa.  PwC urged the Company to take action to dismiss Machado.  On November 3, 2014, Petrobras issued a press release announcing that Machado had "presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days."  On this news, the Company's common ADS declined $0.44 or nearly 3.75% to close at $11.26 per ADS; the preferred ADS declined $0.56 or nearly 4.58%, to close at $11.67; and the other Petrobras Securities declined materially.

93

283.     On November 9, 2014, *The Financial Times* reported that the U.S. Department of Justice ("DOJ") had opened a criminal investigation on whether Petrobras or its employees were paid bribes and that the SEC had opened a civil investigation into the matter.  Specifically, *The Financial Times* reported that the DOJ and the SEC were investigating whether Petrobras or its employees, middlemen or contractors had violated the Foreign Corrupt Practices Act.  On this news, the Company's common ADS declined $0.28 or nearly 2.5% to close at $10.62 per ADS; the preferred ADS declined $0.23 or nearly 2.04%, to close at $11.04; and the other Petrobras Securities declined materially.

284.     On November 13, 2014, after the market closed, Petrobras issued a press release, which it filed with the SEC on Form 6-K.  The Company acknowledged that if the allegations in Costa's testimony were true, they "could potentially impact the Company's financial statements."  As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that it required additional time to quantify the impact of the corruption allegations on its financial condition.

285.     On November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, without a review by its Independent Auditors."  Petrobras further noted that in light of the investigation, it was not possible for the Company to determine an estimated date for the disclosure of its third quarter results.

286.     That same day, Petrobras was rocked by more bad news when the Brazilian federal police arrested Duque (former director of engineering and services).  Duque's arrest revealed to the market that Costa's bribery and graft admissions were not the actions of a rogue employee, but instead spread throughout the Company.  That same day, the Brazilian federal police arrested twenty-six other likely Cartel members in connection with the investigation of

Petrobras, including senior executives and contractors who had contracts with Petrobras worth approximately $59 billion.  The federal police also served dozens of search warrants and raided the offices of eleven companies that they suspected of participation in the scam.  *The Financial Times* and other publications reported that the offices of Petrobras were among the offices that were raided.

287.    Also on November 14, 2014, Bank of America/Merrill Lynch downgraded Petrobras's common stock following revelations of lack of management integrity on the market:

> We are downgrading Petrobras' stock from Buy to Neutral, following postponement of its third quarter earnings release until December 12 due to uncertainty as to financial effects of results of an investigation by the Brazilian Federal Police into charges of money laundering and organized crimes allegedly committed by a former director of the company and other individuals.

288.    On this news, the Company's common ADS declined $0.25 or 2.5%, to close at $9.95; the preferred ADS declined $0.29 or 2.76%, to close at $10.23; and the other Petrobras Securities declined materially.

289.    On November 17, 2014, before the market opened, Petrobras hosted a conference call for analysts and investors to discuss certain aspects of the Company's operations for the third quarter of 2014, provide additional detail regarding the Company's delayed financial statements, and offer commentary on the effects on Petrobras of the unfolding bribery accusations.

290.    In connection with these results, CEO Foster stated in part:

> In light of the accusations and investigations of [O]peration Car Wash . . .  Petrobras is unable to publish its third-quarter 2014 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th

Federal Court of Parana, revealed information that may lead to possible adjustments in the financial statements of our Company.

Because of these depositions, therefore, we need more time to make any possible adjustments to the financial statements. More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and we need more time, as it is fundamentally important to improve our internal controls.

291.   Later, during the question-and-answer portion of the call, CFO Barbassa and CEO Foster engaged in the following exchanges in part:

> [**Analyst**]: [I]f we suppose . . . BRL5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company?  What are the main line items that would be impacted?

> **CFO Barbassa:** The adjustment that perhaps could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . .  In this case, this value should be removed from PP&E line item [adjusted] value and should be taken to the result.

> **CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court.  This was what the judges are calling evidence, temporary evidence.   So in this case, we have a schedule of activities and we have deadlines to each one of these activities.

> For example, there is definition of criteria to measure the effects of losses caused by fraud.  In here, in an objective and material fashion, our reference will be the depositions made so far, the evidence provided that will be submitted to Petrobras by the Federal Police.   We will then use this evidence to have our writedowns, and do the write-downs year after year regarding companies A, B, C or D that we might have contracted.

292.   As the *Washington Post* noted in a November 17, 2014 article titled "'Operation Carwash' in Brazil causes normally staid business meeting to go off script," the conference call contained "[w]ords that nobody wants to hear at a quarterly results event for a world-renowned oil company with a $220.6 billion business plan to complete," including "'corruption,' 'bribe,'

'federal police,' 'internal investigation,' 'over-invoicing,' 'governance,' 'difficult moment' and 'painful.'"  As the *Washington Post* also noted, Foster's representations that no one within the Company "ha[d] any idea of the scale of the corruption problem" in March raised more questions than it answered: "So nobody knew anything.  If not, why not?  There are billions of dollars involved in Operation Carwash.  Two top executives were jailed."

293.    On this news, the Company's common ADS declined $0.62 or 6.23%, to close at $9.33; the preferred ADS declined $0.59 or 5.77%, to close at $9.64; and the other Petrobras Securities declined materially.

294.    On November 20, 2014, various Brazilian media outlets reported that a request had been made to the Brazilian prosecutor to dismiss Foster immediately as Petrobras's CEO.  The media outlets also reported that a request had been made to establish a criminal inquiry into Foster's testimony before the Brazilian Congress on June 11, 2014.  Allegedly, Foster had testified falsely that Petrobras had not received warning from a foreign government's authorities concerning bribery payments by company in that country to Petrobras executives.

295.    On November 24, 2014, an article in Brazilian newspaper *O Globo* reported that at the June 11, 2014 Congressional hearing, Foster was asked if Petrobras had identified any evidence of payments amounting to $139 million to Petrobras employees or executives by one of the Company's contractors.  Foster answered that the Company's internal committee "did not identify, within its activities and scope, payments of any benefits to any of our employees."  Next, Foster was asked whether Petrobras had suspicions of bribery to Petrobras employees as early as 2012.  Foster answered, "I do not confirm this information."

296.    Also on November 24, 2014, after the trading session, Petrobras issued a press release announcing that the Company had received a subpoena from and was under investigation

by the SEC.  Also on that date, during trading hours, it was reported that a construction company executive had presented the Brazilian federal police with receipts for bribes paid to a representative of former Petrobras executive Renato Duque.

297.    On this news, the Company's common ADS declined $0.34 or 3%, to close at $10.50; the preferred ADS declined $0.38 or 3.32%, to close at $11.06; and the other Petrobras Securities declined materially.

298.    On November 28, 2014, *Bloomberg* reported that according to *Valor*, Brazilian investigators had presented their findings on the structure used to embezzle Petrobras funds to offshore bank accounts and tax haven territories.  Investigators found that money was diverted to Chinese banks to be redistributed to dozens of secret European bank accounts. On this news, Petrobras' common ADS declined $0.88, or 8.3%, to close at $9.72; the preferred ADS declined $1.00, or 8.92%, to close at $10.21; and the other Petrobras Securities declined materially.

299.    On December 2, 2014, Fitch Ratings reported that the corruption allegations may affect Petrobras's credit quality to the extent the allegations slowed production growth, affected the Company's access to debt capital markets, and resulted in monetary penalties.  On this news, Petrobras's common ADS declined $0.12, or 1.32%, to close at $9.00; the preferred ADS declined $0.14, or 1.45%, to close at $9.51; and the other Petrobras Securities declined materially.

300.    Investors expected the Company's December 12, 2014 earnings release to clarify the impact of corruption at the Company.  On December 11, 2014, *Forbes* noted:

> Petrobras is expected to announce its unaudited financial results for the third quarter on December 12, after a delay of more than a month, primarily because of ongoing investigations into the alleged bribery and corruption scandal that has hit the company. We expect a focus on the potential impact of the ongoing probe to

> overshadow improvements in the company's key business drivers
> such as net upstream production and downstream margins.

301.    However, on December 12, 2014, the Company announced that it would delay

for the second time the release of its third quarter 2014 financial statements as a result of new

developments in the widening corruption probe, including the December 11, 2014 indictments of

executives at Brazil's largest engineering firms.  Although Petrobras had announced December

12, 2014 as its deadline to release the financial statements, the Company said that it actually had

until January 15, 2015 to release financial results without breaching any debt covenants.

*Bloomberg* reported that the real reason for the delay was due to "disagreement" among

Petrobras's Board of Directors, who "differ[ed] on the size of writedowns stemming from graft-

related costs."

302.    That same day, Fonseca appeared on a popular televised weekly news show

called *Fantástico*, where she described the significant efforts she made to alert Foster, Costa, and

others to the corruption as far back as 2009.  Fonseca detailed how in 2008, while working under

Costa, she discovered numerous irregularities and misappropriations of resources with the

construction of the Abreu Refinery.

303.    On this news, Petrobras's common ADS declined $0.31, or 4.18%, to close at

$7.11; the preferred ADS declined $0.41, or 5.1378%, to close at $7.57; and the other Petrobras

Securities declined materially.

304.    On December 15, 2014, Brazilian authorities indicted Nestor Cerveró (former

head of Petrobras's distribution subsidiary and Chief International Officer) for acts of corruption

and money laundering.  Cerveró was implicated in, among other things, receiving tens

of millions of dollars of bribes in connection with the purchase of the Pasadena Refinery, as well

as an additional $53 million in bribes in connection with a deal to supply offshore drilling vessels

by a contractor.  With Cerveró's arrest, investors learned that the corruption at Petrobras was more rampant and broader in scope than had previously been disclosed.  Due to his former position as Chief International Officer, Cerveró's arrest indicated the criminal scheme was not confined to Brazil, but was international in scope.

305.    On this news, Petrobras's common ADS declined $0.72 or 10.3%, to close at $6.26; the preferred ADS declined $0.78 or 10.5%, to close at $6.66; and the other Petrobras Securities declined materially.

306.    Petrobras did not release its third-quarter financial statements until January 27, 2015, after the markets closed.  The financial statements did not include any write-down to the Company's PP&E, and the Company's external auditor, PwC, refused to sign the financial statements.

307.    Nevertheless, in the Company's January 27, 2015 earnings release filed with the SEC, the Company revealed the staggering scope of the corruption scheme.  In Note 3 to the release, in a heading titled "Reasons to correct the carrying amount of specified property, plant and equipment," the Company acknowledged that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

308.    The Company also admitted that it improperly capitalized as assets the inflated contract amounts confessed to by Costa, resulting in material overstatements of its PP&E:

> The payments related to the misconduct previously mentioned were recognized as part of the cost of certain property, plant and equipment and, as of September 30, 2014, most of those assets

were under construction or were recently completed, and therefore, had little accumulated depreciation.

No impairment losses have been recognized in the past for the property, plant and equipment affected by the payments related to misconduct because their recoverability is tested for impairment in cash-generating units (CGU), whose value-in-use has been historically higher than their carrying amounts. The recoverable amount calculated under the value-in-use approach includes the benefits of existing synergies between the assets that comprise the CGU.

Therefore, under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized.

309. Although Petrobras acknowledged that the corruption scandal would require substantial financial adjustments to the Company's balance sheet and income statement, it did not record a write-down. As the Company disclosed, however, its internal review indicated a range of potential write-downs anywhere between U.S.$1.5 billion and U.S.$34 billion.

310. In a January 27, 2015 letter to shareholders accompanying Petrobras's third-quarter results, Foster admitted that the "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." Foster also admitted that an internal review of assets impacted by the fraud uncovered R$88.6 billion (approximately U.S.$34 billion) of overvalued assets and R$27.2 billion (approximately U.S.$10 billion) of undervalued assets. As *Reuters* reported: "If confirmed by auditors, that would lead to a [R$]61.4 billion [(approximately U.S.$22 billion)] writedown, an amount equal to more than half the company's current [R$]120 billion [(approximately U.S.$43.3 billion)] real market value." In that same letter, Foster stated that the company was working with PwC to adjust its financial statements

and to "enhance [its] internal controls"; to that end, the Company's earnings release identified several measures it was implementing to strengthen its internal controls.

311.    Reportedly, on January 27, 2015, Petrobras's Board of Directors held a "marathon meeting" that lasted about ten hours, where two of President Rousseff's top appointees—Foster and Petrobras's Chairman of the Board and former finance minister— heatedly disagreed about releasing a U.S.$30 billion write-down partially tied to the scandal-related losses.  Reportedly, the Chairman left the meeting to call Rousseff, telling her that U.S.$30 billion was a bad number conjured up by faulty methodology.  Rousseff agreed.  Later that evening, Foster called Rousseff and explained her opinion that under Brazilian law, the Company had to release the $30 billion figure—whether faulty or not—because if the Board of Directors knew of the potential write-down amount, the market had a right to know as well. After the dramatic showdown, the Board of Directors initially decided to include the figure in a note to Petrobras's overdue third-quarter earnings.

312.    The next day, however, on January 28, 2015, Petrobras released its delayed unaudited third-quarter results without the graft write-down, leaving investors in the dark over the financial impact of the multibillion dollar corruption scandal.  It was reported that after initially concluding to take the $30 billion write-down, the Board of Directors reversed itself under pressure from the Chairman.

313.    After the meeting, Petrobras released a statement that it "understands that it will be necessary to make adjustments at the financial statements to correct the [carrying] values of fixed assets that may have been impacted by amounts related to misconducts made by suppliers, politicians, Petrobras employees and other groups in the context of the Lava Jato

operation."  The Company further stated such revisions were necessary because court documents showed "illicit acts, such as suppliers' cartelization and bribes received by former employees."

314.    Caving to Rousseff, Foster changed her position, stating it was "impractical" to quantify the write-down because it was not easy to separate corruption-related charges from those caused by other factors.  Brazilian accounting experts questioned that explanation.  For example, an accounting professor in Brazil stated, "There is no reason for the company not to have estimated, even in a provisional way, the writedowns related to corruption . . . I have the strong impression that this is the government trying to avoid the inevitable."

315.    On this news, the Company's common ADS declined $0.89 or 11.95%, to close at $6.56; the preferred ADS declined $0.92 or 11.70%, to close at $6.94; and the other Petrobras Securities declined materially.

316.    On February 25, 2015, Moody's stripped the Company of its investment grade bond rating, as the Company faced a widening corruption probe.  A Moody's analyst stated the downgrade "reflects increasing concern about corruption investigations and liquidity pressures." On this news, the Company's common ADS declined $0.37 or 5.39%, to close at $6.49; the preferred ADS declined $0.47 or 6.72%, to close at $6.52; and the other Petrobras Securities declined materially.

317.    Petrobras's wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs.  The disclosures of previously misrepresented and concealed facts about Petrobras's involvement in a decade-long bribery scheme and its impact on the Company's financial statements, set forth in paragraphs 281 through 316 above, caused the price of the Petrobras Securities to decline materially.

318.     It was entirely foreseeable to Petrobras that concealing from the public, *inter alia*, its involvement in a bid-rigging and bribery scheme that vastly inflated the value of Petrobras's construction contracts and its improper capitalization of overpayments and bribes would artificially inflate the price of Petrobras's securities.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Petrobras's misconduct, would cause the price of Petrobras Securities to decline as the inflation caused by Petrobras's earlier misrepresentations and omissions was removed from the price of Petrobras's securities.  Accordingly, the conduct of Petrobras, as alleged herein, proximately caused foreseeable losses for Plaintiffs, who purchased Petrobras Securities during the Relevant Period.

### D.     Defendants' Knowledge of the Fraudulent Scheme

319.     During the Relevant Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted with reckless disregard for the true information known to them at the time, for the reasons discussed above.  In doing so, Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of the securities, such as Plaintiffs.

#### 1.     Petrobras, PifCo, and PGF

320.     The evidence that Petrobras and its subsidiaries PifCo and PGF knew of the bribery scheme, the inflation of Petrobras's asset valuations, and the falsity of the statements discussed in Section VI.B above, or at a minimum were reckless for not knowing these matters, includes, but is not limited to the following:

a.     Persons involved in implementing the bribery scheme and inflating Petrobras's asset values were high-ranking Petrobras executives, including the former head of Petrobras's refining division and former director of services, whose knowledge may be imputed to Petrobras.

b.  From 2009 to 2013, the TCU reported directly to Petrobras's Board of Directors regarding widespread overcharging on contracts and irregular tendering practices at the Abreu Refinery and recommended that the project be suspended until the irregularities were resolved.  The Board overruled this recommendation.

c.  Prosecutors have frozen the assets of former CEO Gabrielli and are preparing an indictment against him in connection with his involvement in the bribery scheme. One of the persons involved in the scheme has said that Petrobras's CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme.

d.  In 2009, a Petrobras executive warned then-CEO Foster about inflated contracts on refinery projects and was fired soon thereafter.

e.  The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

f.  The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

g.  The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

## 2.  Foster

321.  The evidence that Foster knew of the bribery scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in Section VI.B above, or at a minimum was reckless for not knowing these matters, includes, but it not limited to the following:

a.  One of the persons involved in the scheme has said that Petrobras's CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme.

b.  In 2009, a Petrobras executive warned Foster about inflated contracts on refinery projects and was fired soon thereafter.

c.  The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six

political parties, and a former energy minister, supports an inference that as CEO, Foster knew of the scheme or was reckless for not knowing of it.

d.    The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that Foster, as CEO, knew of the scheme or was reckless for not knowing of it.

e.    The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Foster, as CEO of the Company, knew of the scheme or was reckless for not knowing of it.

### 3.    Gabrielli

322.    The evidence that Gabrielli knew of the bribery scheme, the inflation of Petrobras's asset valuations, and the falsity of the statements discussed in Section VI.B above, or at a minimum was reckless for not knowing these matters, includes the following:

a.    Prosecutors have frozen Gabrielli's assets and are preparing an indictment against him.  One of the persons involved in the scheme has said that Petrobras's CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme.

b.    The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CEO, Gabrielli knew of the scheme or was reckless for not knowing of it.

c.    The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that Gabrielli, as CEO, knew of the scheme or was reckless for not knowing of it.

d.    The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Gabrielli, the CEO of the Company, either knew of the scheme or was reckless for not knowing of it.

### 4.    Barbassa

323.    The evidence that Barbassa knew of the bribery scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in Section VI.B above, or at a minimum was reckless for not knowing these matters, includes the following:

a.  The fact that the scheme involved many outside parties of major importance to Petrobras, including twenty-three contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that as CFO, Barbassa knew of the scheme or was reckless for not knowing of it.

b.  The fact that the scheme caused Petrobras's asset values to be overstated by over $2.5 billion supports an inference that Barbassa, as CFO, knew of the scheme or was reckless for not knowing of it.

c.  The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that as CFO of the Company, Barbassa knew of the scheme or was reckless for not knowing.

**E.  Plaintiffs' Detrimental Reliance on Defendants' Misrepresentations**

**1.  Direct Reliance on Defendants' Misrepresentations**

(a)  <u>PIMCO's Direct Reliance on Defendants' Misrepresentations</u>

324.  During the Relevant Period, PIMCO employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs (the PIMCO funds and the PIMCO separate accounts) that invested with PIMCO.  Throughout the Relevant Period, PIMCO's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs to identify companies with attractive risk-adjusted returns.

325.  PIMCO employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, PIMCO relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, PIMCO reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, PIMCO's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-

corruption policies.  PIMCO's investment managers also relied on Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

326.    PIMCO's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  PIMCO's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

327.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, PIMCO's investment managers' investment decisions with respect to the Petrobras Securities.

328.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, PIMCO purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(b)    Aberdeen's Direct Reliance on Defendants' Misrepresentations

329.    During the Relevant Period, Aberdeen employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Aberdeen.  Throughout the Relevant Period, Aberdeen's investment managers

undertook rigorous, security-specific research on behalf of Plaintiffs to identify companies with attractive risk-adjusted returns.

330.     Aberdeen employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Aberdeen relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Aberdeen reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Aberdeen's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  Aberdeen's investment managers also relied on Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

331.     Aberdeen's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  Aberdeen's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

332.     Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets,

PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Aberdeen's investment managers' investment decisions with respect to the Petrobras Securities.

333.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Aberdeen purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(c)    Baillie Gifford's Direct Reliance on Defendants' Misrepresentations

334.    During the Relevant Period, Baillie Gifford employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Baillie Gifford.  Throughout the Relevant Period, Baillie Gifford's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' Baillie Gifford-managed investments to identify companies with attractive risk-adjusted returns.

335.    Baillie Gifford employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Baillie Gifford relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Baillie Gifford reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Baillie Gifford's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses,

PP&E, and anti-bribery and anti-corruption policies.  In addition, Baillie Gifford's investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

336.    Baillie Gifford's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  Baillie Gifford's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

337.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Baillie Gifford's investment managers' investment decisions with respect to the Petrobras Securities.

338.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Baillie Gifford purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

> (d)    BlackRock's Direct Reliance on Defendants' Misrepresentations

339.    During the Relevant Period, BlackRock employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with BlackRock.  Throughout the Relevant Period, BlackRock's

investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' BlackRock-managed investments to identify companies with attractive risk-adjusted returns.

340.     BlackRock employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, BlackRock relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, BlackRock reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, BlackRock's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, BlackRock's investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

341.     BlackRock's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  BlackRock's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

342.     Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets,

PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, BlackRock's investment managers' investment decisions with respect to the Petrobras Securities.

343.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, BlackRock purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(e)      D&C's Direct Reliance on Defendants' Misrepresentations

344.    During the Relevant Period, D&C employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with D&C.  Throughout the Relevant Period, D&C's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' D&C-managed investments to identify companies with attractive risk-adjusted returns.

345.    D&C employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, D&C relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, D&C reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, D&C's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, D&C's investment managers relied upon Petrobras's representations

concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

346.    D&C's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  D&C's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

347.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, D&C's investment managers' investment decisions with respect to the Petrobras Securities.

348.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, D&C purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(f)    GSAM's Direct Reliance on Defendants' Misrepresentations

349.    During the Relevant Period, GSAM employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with GSAM.  Throughout the Relevant Period, GSAM's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' GSAM-managed investments to identify companies with attractive risk-adjusted returns.

350.    GSAM employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, GSAM relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, GSAM reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, GSAM's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, GSAM's investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

351.    GSAM's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  GSAM's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

352.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on,

and were a substantial factor in bringing about, GSAM's investment managers' investment decisions with respect to the Petrobras Securities.

353.   In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, GSAM purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(g)   Guardian's Direct Reliance on Defendants' Misrepresentations

354.   During the Relevant Period, Mr. Robert Crimmins, who managed investment decisions on behalf of Guardian's non-PIMCO-managed investments, supervised a team of credit analysts that undertook rigorous, security-specific research on behalf of Guardian to identify companies with attractive risk-adjusted returns.

355.   Mr. Crimmins's team employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investments decisions regarding Petrobras and its affiliates, Mr. Crimmins's team relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Mr. Crimmins's team reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Mr. Crimmins's team relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, Mr. Crimmins's team relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

356.   Mr. Crimmins's team relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's

financial condition.  Mr. Crimmins's team did not know, and in the exercise of reasonable

diligence could not have known, that Petrobras's statements during the Relevant Period were

materially false and misleading or materially incomplete, especially because, as explained above,

Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption

policies.

357.    Petrobras's false or misleading statements in its public statements, including

Petrobras's representations concerning its net income and periodic expenses, value of assets,

PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and

procedures, including internal controls over financial reporting, had a material influence on, and

were a substantial factor in bringing about, Mr. Crimmins's team's investment decisions with

respect to the Petrobras Securities.

358.    In reasonable reliance upon the materially false and misleading statements

included in Petrobras's public statements, Mr. Crimmins's team purchased the Petrobras

Securities at artificially inflated prices.

(h)    Jennison's Direct Reliance on Defendants' Misrepresentations

359.    During the Relevant Period, Jennison employed in-house investment managers to

manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs

that invested with Jennison.  Throughout the Relevant Period, Jennison's investment managers

undertook rigorous, security-specific research on behalf of Plaintiffs' Jennison-managed

investments to identify companies with attractive risk-adjusted returns.

360.    Jennison employed an analytical, research-based approach to determine whether

to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions

regarding Petrobras and its affiliates, Jennison relied on numerous sources of information,

including Petrobras's publicly filed financial statements, corporate web page, press releases, and

conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Jennison reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Jennison's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, Jennison's investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

361.    Jennison's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  Jennison's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

362.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Jennison's investment managers' investment decisions with respect to the Petrobras Securities.

363.     In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Jennison purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(i)     J.P. Morgan's Direct Reliance on Defendants' Misrepresentations

364.     During the Relevant Period, J.P. Morgan employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with J.P. Morgan.  Throughout the Relevant Period, J.P. Morgan's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' J.P. Morgan-managed investments to identify companies with attractive risk-adjusted returns.

365.     J.P. Morgan employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, J.P. Morgan relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, J.P. Morgan reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, J.P. Morgan's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, J.P. Morgan's investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

366.     J.P. Morgan's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  J.P. Morgan's investment managers did not know, and in the

exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

367.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, J.P. Morgan's investment managers' investment decisions with respect to the Petrobras Securities.

368.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, J.P. Morgan purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(j)    Loomis Sayles's Direct Reliance on Defendants'
         Misrepresentations

369.    During the Relevant Period, Loomis Sayles employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Loomis Sayles.  Throughout the Relevant Period, Loomis Sayles's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' Loomis Sayles-managed investments to identify companies with attractive risk-adjusted returns.

370.    Loomis Sayles employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Loomis Sayles relied on numerous sources of

information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports. With respect to Petrobras's financial statements, Loomis Sayles reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B. In particular, Loomis Sayles's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies. In addition, Loomis Sayles's investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

371. Loomis Sayles's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition. Loomis Sayles's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

372. Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Loomis Sayles's investment managers' investment decisions with respect to the Petrobras Securities.

373.     In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Loomis Sayles purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(k)     MII Life, Inc.'s Direct Reliance on Defendants' Misrepresentations

374.     During the Relevant Period, Mr. John Orner made investments on behalf of MII Life, Inc. and undertook rigorous, security-specific research on behalf of MII Life, Inc. to identify companies with attractive risk-adjusted returns.

375.     Mr. Orner employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investments decisions regarding Petrobras and its affiliates, Mr. Orner relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Mr. Orner reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Mr. Orner relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  Mr. Orner also relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

376.     Mr. Orner relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  Mr. Orner did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

377.     Petrobras's false or misleading statements in its public statements, including

Petrobras's representations concerning its net income and periodic expenses, value of assets,

PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and

procedures, including its internal controls over financial reporting, had a material influence on,

and were a substantial factor in bringing about, Mr. Orner's investment decisions with respect to

the Petrobras Securities.

378.     In reasonable reliance upon the materially false and misleading statements

included in Petrobras's public statements, MII Life, Inc. purchased the Petrobras Securities at

artificially inflated prices.

(l)     Oaktree's Direct Reliance on Defendants' Misrepresentations

379.     During the Relevant Period, Oaktree employed in-house investment managers to

manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs

that invested with Oaktree.  Throughout the Relevant Period, Oaktree's investment managers

undertook rigorous, security-specific research on behalf of Plaintiffs' Oaktree-managed

investments to identify companies with attractive risk-adjusted returns.

380.     Oaktree employed an analytical, research-based approach to determine whether to

buy, sell, or hold securities.  Consistent with this approach, in making investment decisions

regarding Petrobras and its affiliates, Oaktree relied on numerous sources of information,

including Petrobras's publicly filed financial statements, corporate web page, press releases, and

conference calls with investors, along with industry analyst reports.  With respect to Petrobras's

financial statements, Oaktree reviewed the Forms 20-F and Forms 6-K that Petrobras filed with

the SEC, including the representations contained therein described in Section VI.B.

381.     Oaktree's investment managers relied on Petrobras's statements as being

materially complete and as not omitting material information, including information regarding

Petrobras's financial condition.  Oaktree's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete.

382.    Petrobras's false or misleading statements in its public statements had a material influence on, and were a substantial factor in bringing about, Oaktree's investment managers' investment decisions with respect to the Petrobras Securities.

383.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Oaktree purchased the Petrobras Securities at prevailing market prices on Plaintiffs' behalf.

(m)    Principal's Direct Reliance on Defendants' Misrepresentations

384.    During the Relevant Period, Principal employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Principal.  Throughout the Relevant Period, Principal's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' Principal-managed investments to identify companies with attractive risk-adjusted returns.

385.    Principal employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Principal relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Principal reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Principal's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and

anti-corruption policies. In addition, Principal relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

386.    Principal's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition. Principal's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

387.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Principal's investment managers' investment decisions with respect to the Petrobras Securities.

388.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Principal purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(n)    Reams's Direct Reliance on Defendants' Misrepresentations

389.    During the Relevant Period, Reams employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Reams. Throughout the Relevant Period, Reams's investment managers

undertook rigorous, security-specific research on behalf of Plaintiffs' Reams-managed investments to identify companies with attractive risk-adjusted returns.

390.    Reams employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Reams relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Reams reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Reams's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, and PP&E.  In addition, Reams relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

391.    Reams's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  Reams's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls.

392.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing

about, Reams's investment managers' investment decisions with respect to the Petrobras Securities.

393.   In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Reams purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(o)   Wells' Direct Reliance on Defendants' Misrepresentations

394.   During the Relevant Period, Wells employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Wells.  Throughout the Relevant Period, Wells' investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' Wells-managed investments to identify companies with attractive risk-adjusted returns.

395.   Wells employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Wells relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Wells reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Wells' investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, Wells relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

396.   Wells' investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's

127

financial condition.  Wells' investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

397.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Wells' investment managers' investment decisions with respect to the Petrobras Securities.

398.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Wells purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(p)    Western Asset's Direct Reliance on Defendants' Misrepresentations

399.    During the Relevant Period, Western Asset employed in-house investment managers to manage its investment portfolios and to make investment decisions on behalf of those Plaintiffs that invested with Western Asset.  Throughout the Relevant Period, Western Asset's investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' Western Asset-managed investments to identify companies with attractive risk-adjusted returns.

400.    Western Asset employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment

decisions regarding Petrobras and its affiliates, Western Asset relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, Western Asset reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, Western Asset's investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, Western Asset relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

401.    Western Asset's investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's financial condition.  Western Asset's investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

402.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, Western Asset's investment managers' investment decisions with respect to the Petrobras Securities.

403.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, Western Asset purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

(q)    Other Investment Managers' Direct Reliance on Defendants' Misrepresentations

404.    During the Relevant Period, Plaintiffs employed other investment managers to manage their investment portfolios and to make investment decisions on their behalf. Throughout the Relevant Period, these investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' investments to identify companies with attractive risk-adjusted returns.

405.    These investment managers employed an analytical, research-based approach to determine whether to buy, sell, or hold securities.  Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, these investment managers relied on numerous sources of information, including Petrobras's publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports.  With respect to Petrobras's financial statements, these investment managers reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section VI.B.  In particular, these investment managers relied upon Petrobras's representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies.  In addition, these investment managers relied upon Petrobras's representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

406.    These investment managers relied on Petrobras's statements as being materially complete and as not omitting material information, including information regarding Petrobras's

financial condition.  These investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

407.    Petrobras's false or misleading statements in its public statements, including Petrobras's representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on, and were a substantial factor in bringing about, these investment managers' investment decisions with respect to the Petrobras Securities.

408.    In reasonable reliance upon the materially false and misleading statements included in Petrobras's public statements, these investment managers purchased the Petrobras Securities at artificially inflated prices on Plaintiffs' behalf.

### 2.    Fraud on the Market Presumption of Reliance

409.    Plaintiffs may also rely upon a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

b.    The omissions and misrepresentations were material;

c.    The Petrobras Securities trade in an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Petrobras Securities; and

e.    Plaintiffs purchased the Petrobras Securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

410.    At all relevant times, the markets for the Petrobras Securities were efficient for the following reasons, among others:

a.    As a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis, including information on behalf of its subsidiaries PifCo and PGF;

b.    Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c.    Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d.    The Petrobras ADS actively traded in efficient markets, including the New York Stock Exchange, where the Company's common and preferred ADS trade under the ticker symbols "PBR" and "PBR/A," respectively.

e.    The Petrobras, PifCo, and PGF debt securities actively traded in an efficient over-the-counter market. During the Relevant Period, these debt securities were widely traded by market makers, including J.P. Morgan, Barclays, Deutsche Bank, Citibank, Goldman Sachs, Merrill Lynch, and Credit Suisse. Moreover, during the Relevant Period, Petrobras, PifCo, and PGF were eligible to file, and on December 11, 2009 and August 29, 2012 did file, a Form F-3, which is a foreign entity's functional equivalent of the Form S-3. During the Relevant Period, the majority of these debt securities were publicly held. Additionally, during the Relevant Period, Petrobras's market capitalization reached a high of over $255 billion.

411.    As a result of the foregoing, the markets for the Petrobras Securities promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the Petrobras Securities. Under these circumstances, Plaintiffs were injured by their purchases of the Petrobras Securities during the Relevant Period at artificially inflated prices, and the presumption of reliance applies.

412.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its subsidiaries, Plaintiffs are entitled to a

presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

### 3.     No Safe Harbor

413.    Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements issued during the Relevant Period were ineffective to shield those statements from liability.

414.    Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Petrobras, PifCo, and/or PGF that knew the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

### F.     Plaintiffs' Losses

415.    During the Relevant Period, as detailed herein, Defendants made false and misleading statements and engaged in (1) a scheme to deceive the market and (2) a course of conduct that artificially inflated the price of the Petrobras Securities.  Defendants' scheme and course of conduct operated as a fraud and deceived purchasers of such securities, such as Plaintiffs, by misrepresenting Petrobras's asset values, expenses, net income, internal controls, and anti-corruption policies.

416.    Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market, the price of the Petrobras Securities fell as the "value" of the prior artificial inflation was eliminated from the prices of the securities.  As a result of their purchases of the Petrobras Securities during the Relevant Period, Plaintiffs suffered economic loss.

## VII.    EXCHANGE ACT CAUSES OF ACTION

### COUNT I

#### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants

417.    Plaintiffs re-allege each and every allegation above in paragraphs 1 through 416 above as if fully set forth herein.  This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against all Defendants.  During the Relevant Period, Defendants disseminated or approved the false statements specified above, which they knew to be false and misleading, or were reckless in their disregard as to the truth of such statements, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

418.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.    Employed devices, schemes, and artifices to defraud;

b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of the Petrobras Securities during the Relevant Period.

419.     Plaintiffs have suffered damages in that, in reliance on Defendants' statements and the integrity of the market, they paid artificially inflated prices for the Petrobras Securities. Plaintiffs would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by Defendants' misleading statements.

420.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Petrobras Securities during the Relevant Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Gabrielli, Foster, and Barbassa

421.     Plaintiffs re-allege each and every allegation above in paragraphs 1 through 416 above as if fully set forth herein.

422.     During the Relevant Period, defendants Gabrielli, Foster, and Barbassa acted as controlling persons of Petrobras within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about the Company, defendants Gabrielli, Foster, and Barbassa had the power and ability to control the actions of Petrobras and the employees thereof.  By reason of such conduct, Defendants Gabrielli, Foster, and Barbassa are liable pursuant to Section 20(a) of the Exchange Act.

## VIII.   SECURITIES ACT

### A.     Overview of Claims

423.     Plaintiffs' claims arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and are based on strict liability and/or the absence of any affirmative defense.

**B.     Relevant Securities Offerings**

424.    Plaintiffs repeat, incorporate, and re-allege paragraphs 102 through 106 above by reference.

**C.     False and Misleading Statements**

425.    On August 29, 2012, Petrobras, PifCo and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement incorporated by reference a number of documents, including (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011; and (2) the August 10, 2012 Form 6-K containing financial information for the six-month period ended June 30, 2011.  These documents contained material misstatements and omissions, as described in paragraphs 218 through 222 and 229 through 230 above.

426.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, comprising $11 billion in six series of notes to be issued by PGF.  On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2012 Form 20-F; and (2) the Petrobras Form 6-K filed with the SEC on August 10, 2012, which contained financial information for the six-month periods ended June 30, 2012 and 2011.  Both of these documents contained material misstatements and omissions, as described in paragraphs 229 through 230, 238 through 240, and 244 through 245 above.

427.    On March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, comprising $8.5 billion in six series of notes to be issued by PGF.  On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo Form 20-F for 2012; and (2) the Petrobras Form 6-K filed with the SEC on February 25, 2014, which contained financial statements for the year ending December 31, 2013.  Both of

those documents contained material misstatements and omissions, as described in paragraphs 244 through 245 and 258 through 263 above.

## IX.    SECURITIES ACT CAUSES OF ACTION

### COUNT III

**For Violations of Section 11 of the Securities Act
Against All Defendants**

428.    Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 175 and 423 through 427 above as if set forth fully herein.

429.    As set forth in the Appendix, Plaintiffs purchased or otherwise acquired the 2013 Notes between May 13, 2013 and August 11, 2014, and/or 2014 Notes between March 10, 2014 and May 15, 2015, pursuant or traceable to the materially false and misleading 2012 Registration Statement, 2013 Offering Documents, and/or 2014 Offering Documents.

430.    Petrobras, PifCo, and PGF caused the 2012 Registration Statement, 2013 Offering Documents, and/or 2014 Offering Documents to be issued to investors in connection with the offering and sale of the 2013 Notes and 2014 Notes as detailed in paragraphs 102 through 106 above.

431.    Petrobras, PifCo, and PGF are strictly liable for the misstatements and omissions.

432.    The Individual Defendants signed the 2012 Registration Statement, 2013 Offering Documents, and/or 2014 Offering Documents as detailed in paragraphs 78 through 91 above.

433.    The Individual Defendants owed Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2012 Registration Statement, 2013 Offering Documents, and/or 2014 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material fact required to be stated in order to make the statements contained therein not misleading.  The

Individual Defendants did not fulfill their duty to make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the 2012 Registration Statement, 2013 Offering Documents and/or 2014 Offering Documents.  Nor did the Individual Defendants possess reasonable grounds for believing that the 2012 Registration Statement, 2013 Offering Documents, and/or 2014 Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  As such, the Individual Defendants are liable.

434.    Plaintiffs have sustained damages.  The values of the 2013 Notes and/or 2014 Notes have declined substantially subsequent to, and due to, Defendants' violations.

435.    By virtue of the foregoing, the above-named Plaintiffs are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Defendants.

**COUNT IV**

**For Violations of Section 15 of the Securities Act Against
Foster, Gabrielli, Barbassa, Silva, Pinheiro, Oliveira, Pereira, Tinoco,
Alves, Barbosa, Fernandes, Zacarias, and Looman**

436.    The above-named Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 175 and 423 through 427 above as if set forth fully herein.

437.    The Individual Defendants were, by virtue of their control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged herein and as set forth herein, controlling persons of PGF or PifCo within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause PGF and/or PifCo to engage in the acts described herein.

438.    The Individual Defendants' control, ownership, and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiffs.

138

439.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the above wrongful conduct and are liable to the above-named Plaintiffs for damages suffered as a result.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

440.    Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

441.    Awarding Plaintiffs pre- and post-judgment interest, as well as their reasonable attorneys' fees , expert fees, and other costs; and

442.    Awarding such other and further relief as this Court may deem just and proper.

## XI.    JURY DEMAND

443.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action on all issues so triable.

Dated: October 16, 2015

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Harry A. Olivar, Jr. (HO-5621)
Kristen Bird (*pro hac vice admission pending*)
Joseph C. Sarles (*pro hac vice admission pending*)
Ryan S. Landes (*pro hac vice admission pending*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Peter E. Calamari (PEC-3964)
Todd D. Batson (TB-0629)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Daniel Pulecio-Boek (*pro hac vice admission pending*)
777 6th Street NW, 11th Floor
Washington, D.C. 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

*Attorneys for Plaintiffs*